# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

PATRICK NICHOLAS MCGUIRE,

     Plaintiff,

vs.                                                                No. CIV 17-1208 JB\LF

KIRSTJEN NIELSEN, Secretary, U.S.
Department of Homeland Security; L.
FRANCIS CISSNA, Director, U.S. Citizenship
and Immigration Services; GREGORY A.
RICHARDSON, Director, Texas Service
Center, U.S. Citizenship and Immigration
Services; JOHN OR JANE DOE, Officer XM
1009, Texas Service Center, U.S. Citizenship
and Immigration Services,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Partial Motion to Dismiss Plaintiff's First Amended Complaint, filed April 25, 2018 (Doc. 29)("Partial MTD"). The Court held a hearing on September 6, 2018. The primary issues are: (i) whether Plaintiff Patrick Nicholas McGuire's allegation in the First Amended Complaint for Declaratory and Injunctive Relief, filed April 17, 2018 (Doc. 26)("Complaint"), that the United States Citizenship and Immigration Services ("Immigration Services") took longer than average to approve his Form I-360 petition[1] states a claim under the Equal Protection and Due Process Clauses of the Fifth Amendment of the Constitution of the United States of America; (ii) whether Father Patrick Nicholas McGuire's allegation that Immigration Services unreasonably delayed approving his Form I-360 states a claim

---

[1]A Form I-360 petition, if granted, classifies an immigrant as a special immigrant. A granted petition enables the immigrant to file for a green card via a Form I-485 application.

upon which relief can be granted under the Administrative Procedure Act, 5 U.S.C. §§ 702-06 ("APA"); (iii) whether Father McGuire has stated a claim for ineffective assistance independent of § 706 APA review of his Form I-485 application[2] denial, because he alleges that a non-attorney employee of the Roman Catholic Diocese of Gallup, New Mexico, misadvised him whether he needed to seek an extension of his R-1 visa[3]; and (iv) whether Father McGuire has stated a claim for equitable tolling, because he alleges that the bad advice and the abnormally long time that the Defendants took to grant his Form I-360 petition caused the lapse in his lawful status. The Court concludes that the Complaint states a single claim for relief under the APA. Father McGuire's Claims for violations of the Equal Protection and Due Process Clauses, ineffective assistance, and equitable tolling stated in the Complaint provide Father McGuire's arguments why he is entitled relief under the APA and do not provide independent grounds for relief outside the APA. To the extent that the Complaint requests review of the Form I-360 application, the Court dismisses that Claim, because the Court does not have jurisdiction under Article III of the Constitution to properly grant relief on the accepted Form I-360. Accordingly, the Court grants the Partial MTD.

## FACTUAL BACKGROUND

Father McGuire is a sixty-nine-year-old citizen of the United Kingdom and a Roman Catholic Priest. See Complaint ¶ 9, at 4. He entered the United States on a Special Immigrant Religious Worker visa in August, 2013, which authorized him to work for the Roman Catholic

---

[2] A Form I-485 application is the application through which immigrants receive green cards. If granted, tt adjusts an immigrant's status to Lawful Permanent Resident.

[3] An R-1 visa permits an alien entrance to the United States for temporary employment as a minister or in another religious vocation or occupation. See U.S. Citizenship and Immigration Services, R-1 Temporary Nonimmigrant Religious Workers, https://www.uscis.gov/working-united-states/temporary-workers/r-1-temporary-nonimmigrant-religious-workers.

Diocese in Gallup.  See Complaint ¶ 13, at 6.  The Diocese's poor financial state[4] recently led it to abandon using paid immigration attorneys and to instead give this work to Denise Lujan, a diocesan officer manager "with no formal immigration law training."  Complaint ¶¶ 21, 28 at 8, 9.

Father McGuire's visa was valid from July 1, 2013, to December 31, 2015.  See Complaint ¶ 27, at 9.  Father McGuire asked Lujan in April, 2015, whether he needed to extend his visa.  See Complaint ¶ 28, at 9.  Lujan told him that it was too early to apply for an extension.  See Complaint ¶ 28, at 9.  In fact, the Diocese could have applied to extend the visa at any time before December 31, 2015.  See Complaint ¶ 27, at 9.  Instead of seeking an extension, Lujan submitted an I-360 application in October, 2015; this form sought approval for Father McGuire to file an I-485, which would adjust his status from a nonimmigrant to a Special Immigrant Religious Worker.  See Complaint ¶ 27, at 9.  Lujan told Father McGuire that, because the Diocese had filed an I-360 application, he could lawfully remain in the United States and did not need to seek a visa extension. See Complaint ¶ 28, at 9-10.  Father McGuire routinely asked Lujan for updates regarding his I-360 application.  See Complaint ¶ 29, at 19.  In July or August of 2016, Immigration Services requested additional information from the Diocese regarding Father McGuire's I-360 application. See Complaint ¶ 29, at 10.  On October 19, 2016, after 356 days, Immigration Services approved Father McGuire's I-360 application.  See Complaint ¶¶ 30, 32 at 10, 11.  Five weeks later, on November 28, 2016, Father McGuire filed his I-485 application with Immigration.  See Complaint ¶ 30, at 10.

---

[4]The Diocese of Gallup filed for bankruptcy in 2013 in response to lawsuits alleging sexual abuse of children by clergy.  See Oliver Uyttebrouck, Settlement of Diocese of Gallup bankruptcy case hits a snag, Albuquerque J., Feb. 3, 2016, https://www.abqjournal.com/717400/settlement-of-diocese-of-gallup-bankruptcy-case-hits-a-snag.html; Mary Wisniewski, Catholic diocese of Gallup, N.M., to file for bankruptcy, Reuters, Sept. 3, 2013, https://www.reuters.com/article/us-usa-church-abuse/catholic-diocese-of-gallup-n-m-to-file-for-bankruptcy-idUSBRE98304G20130904.  The Court offers this information for the reader's edification.

Special Immigrant Religious Worker visa beneficiaries must file and have their I-360 application approved before they can file an I-485 Application.  See Complaint ¶ 34, at 12 (citing 8 C.F.R. § 245.2(a)(2)(i)(B)).  The I-485 adjustment application "authorizes the applicant to remain in the United States until a decision is made on the application."  Complaint ¶ 34, at 12. Section 1255(k) of title 8 of the United States Code allows a religious worker to adjust his or her status to lawful permanent resident so long as his or her failure to maintain a continuous lawful status does not exceed 180 days.  See Complaint ¶ 35, at 12.  Immigration Services denied Father McGuire's I-485 application in May, 2017, because he failed to maintain a lawful immigration status for the eleven months between the expiration of his visa on December 31, 2015, and his I-485 application in November, 2016.  See Complaint ¶ 37, at 13.

Around the same time that Immigration Services processed Father McGuire's forms, Lujan filed two other I-360 applications for foreign priests that Immigration Services approved in less than six months.  See Complaint ¶ 31, at 10.  Immigration Services' website states that it processed cases in the order it received them.  See Complaint ¶ 32, at 10.  The website used to show that the Immigration Services center processing Father McGuire's I-360 petition processed these petitions in 174 days. The same service center now says that it processes fifty percent of petitions in four months, and ninety-three percent of applications in seven months.  See Complaint ¶ 33, at 11. Immigration Services says that its goal is to process applications in six months.  See Complaint ¶ 33, at 11-12.

On June 19, 2017, Father McGuire moved Immigration Services to reconsider and reopen his I-485 denial.  See Complaint ¶ 38, at 13.  He made one argument supporting his motion to reconsider, and two arguments supporting his motion to reopen.  See Complaint ¶ 38, at 13.

Immigration Services responded on October 17, 2017, and denied his motion. <u>See</u> Complaint ¶ 41, at 14.

<u>**PROCEDURAL BACKGROUND**</u>

The Court initially ruled on the Partial MTD on March 14, 2019. <u>See</u> Order, filed March 14, 2019 (Doc. 50)("Order"). In the Order, the Court stated that it would "issue a Memorandum Opinion . . . at a later date more fully detailing its rationale for this decision." Order at 1 n.1. This Memorandum Opinion and Order is that promised opinion.

1. <u>**The Complaint.**</u>

Father McGuire filed the Complaint in federal court on April 17, 2018. <u>See</u> Complaint at 1. He states that Immigration Services approved his I-360 petition after a great delay. <u>See</u> Complaint ¶ 1, at 1. This delay, he argues, caused the agency to subsequently deny his I-485 application. <u>See</u> Complaint ¶ 1, at 2. Father McGuire argues that Immigration Services then wrongfully denied his motions to reopen and to reconsider these decisions. <u>See</u> Complaint ¶ 4, at 3.

Father McGuire asserts four claims. <u>See</u> Complaint ¶¶ 48-65, at 15-18. First, he alleges a "Violations of Duty to Timely Process Visa Petition and to Treat Plaintiff Like Similarly Situated Visa-Petition Beneficiaries," under the APA, the Due Process Clause, and the Equal Protection Clause. Complaint ¶ 50, at 17. <u>See id.</u> at ¶¶ 50-56, at 17-19. His second claim is for violations of the APA, 8 U.S.C. § 1255(c), and 8 C.F.R. § 245.1(d)(2). <u>See</u> Complaint ¶¶ 57-61, at 19-21. Father McGuire's third and fourth claims are for "Ineffective Assistance by Another." Complaint ¶ 62, at 21; Complaint ¶ 68, at 22. He asserts the third claim under the APA, 8 U.S.C. § 1255(c)(2) and (k)(2). <u>See</u> Complaint ¶ 62, at 21. He asserts the fourth claim under the doctrine of equitable tolling. <u>See</u> Complaint ¶ 68, at 22. As relief, Father McGuire seeks: (i) production of the

administrative record; (ii) the Court's review of Immigration Services' Form I-360 and Form I-485 decisions; (iii) an order setting aside the Immigration Service's decisions; (iv) a declaration that Father McGuire was statutorily eligible to file the I-485 on November 28, 2016; (v) a declaration that Father McGuire has not failed to maintain lawful immigration status; (vi) a declaration that Father McGuire "has not to date accrued any 'unlawful presence'" under 8 U.S.C. § 1182(a)(9)(B); (vii) a declaration that Immigration Services violated Father McGuire's rights under the Due Process and Equal Protection Clauses; (viii) an order that Immigration Services approve Father McGuire's I-485 application; (ix) attorney's fees and costs; and (x) any other proper remedy.  See Complaint ¶ 72, at 23-24.

### 2.  **The Partial MTD.**

Defendants Kirstjen Nielsen, Francis Cissna, and Gregory Richardson filed the Partial MTD on April 25, 2018.  See Partial MTD at 1.  The Defendants argue that the Court should dismiss Count 1, Count 3, and Count 4 from the Complaint.  See Partial MTD at 18.  The Defendants do not ask that the Court dismiss Count 2 "to the extent that Count 2 seeks judicial review of final agency action under the APA with respect to the denial of his I-485 application for adjustment of status."  Partial MTD at 18.

### a.  **The Defendants Argue That the Court Should Dismiss Count 1.**

The Defendants first argue that the Court should dismiss Father McGuire's claims based on APA, Due Process Clause, and Equal Protection Clause violations.  See Partial MTD at 10-16. The Defendants argue that "the Amended Complaint does not (and cannot) actually seek any relief with respect to the Form I-360 petition," because, under the APA, a litigant may compel agencies only to act or seek judicial review of final agency action.  Partial MTD at 10-11 (citing 5 U.S.C. § 706(1)-(2)).  They assert that dismissal is appropriate if vacating an agency action "will not

provide any relief to the litigant." Partial MTD at 11 (citing <u>Zixiang v. Kerry</u>, 710 F.3d 995, 1003 (9th Cir. 2013)). The Defendants assert that, because Immigration Services already has approved Father McGuire's petition, there is no live case or controversy, and no reason for the Court to issue "an advisory opinion that USCIS should have 'acted faster' in approving the petition." Partial MTD at 11. The Defendants further argue that Immigration Services' approval of his petition means "there simply is no meaningful relief" that the Court can authorize. Partial MTD at 12 (citing <u>Zixiang v. Kerry</u>, 710 F.3d at 1003; <u>Rio Grande Silvery Minnow v. Bureau of Reclamation</u>, 601 F.3d 1096, 1109 (10th Cir. 2010)).

The Defendants then argue that the Court should dismiss Father McGuire's Equal Protection Clause argument, because he has not alleged that he was treated differently from similarly situated persons. <u>See</u> Partial MTD at 12 (citing <u>Brown v. Montoya</u>, 662 F.3d 1152, 1173 (10th Cir. 2011)). They argue that "the Fifth Amendment does not require USCIS to adjudicate every Form I-360 petition for special immigrant religious workers filed by the Diocese in the same amount of time." Partial MTD at 13.

Finally, the Defendants argue that Father McGuire fails to state a claim under the Due Process Clause. <u>See</u> Partial MTD at 14. They contend that "an alien lacks a protected entitlement in approval of a Form I-485 application." Partial MTD at 15 (citing <u>Hernandez v. Holder</u>, 450 F. App'x 773, 775-76 (10th Cir. Dec. 14, 2011)(unpublished)). The Defendants argue that while Immigration Services applicants are entitled to judicial review under the APA, an agency's application denial cannot serve as the basis for a Due Process claim. <u>See</u> Partial MTD at 16.

**b.    <u>The Defendants Argue That the Court Should Dismiss Count 3.</u>**

The Defendants also argue that the Court should dismiss the Complaint's Count 3, because "there is no cognizable cause of action against the Government for 'ineffective assistance by

another individual.'" Partial MTD at 16. As further support, they cite <u>Marsh v. Soares</u>, 223 F.3d 1217, 1220 (10th Cir. 2000), and <u>Hernandez v. Mukasey</u>, 524 F.3d 1014, 1020 (9th Cir. 2008). <u>See</u> Partial MTD at 16. The Defendants assert that, in light of this caselaw, Father "McGuire fails to state a claim in Count 3 that is separate and apart from his claim for APA review of the denial of his I-485 application in Count 2." Partial MTD at 17.

**c.     <u>The Defendants Argue That the Court Should Dismiss Count 4</u>.**

The Defendants next argue that the Court should dismiss the Complaint's Count 4 equitable tolling claim, because equitable tolling is inapplicable under these circumstances. <u>See</u> Partial MTD at 17. Further, the Diocese did not file an R-1 extension for Father McGuire, and the Defendants contend that this failure means Father McGuire's equitable tolling claim "fails as a matter of law." Partial MTD at 18. The Defendants argue that Father McGuire's Count 4 claim also fails, because, "[t]o the extent, Father McGuire contends that USCIS abused its statutory discretion under 8 U.S.C. § 1255, this would be a claim under the APA for abuse of discretion, not an independent tolling claim." Partial MTD at 18.

**3.     <u>The Response</u>.**

Father McGuire filed a forty-page response. <u>See</u> Plaintiff's Response to Defendants' Partial Motion to Dismiss Amended Complaint, filed May 9, 2018 (Doc. 32)("Response"). Father McGuire states that he seeks the Court's intervention, because the "Defendants all but ignored his motion to reconsider and reopen their decision denying his application to adjust his status," and requests that the Court review the decision denying his motion to reconsider and to reopen, and the decision denying his application for adjustment of status. Response at 1. Father McGuire asserts that both decisions rest on the finding that he is statutorily ineligible to adjust status, because his lawful status has lapsed. <u>See</u> Response at 1. Father McGuire argues that the Defendants caused

- 8 -

this lapse; it was because of "their prolonged delay in processing the I-360 visa petition that he had to await before he could file his I-485 adjustment application." Response at 2. He states that his arguments rely on a number of authorities: (i) 8 U.S.C. § 1255(c)(2) and (k)(2); (ii) 8 C.F.R. § 245.1(d)(2)(ii); (iii) equitable tolling; (iv) the Due Process Clause; and (v) the Equal Protection Clause. See Response at 2.

Father McGuire first addresses Count 3, and asserts that, while "[h]e knew nothing about I-360s," he knew "that he was to follow the directions of Denise Lujan, the Diocesan employee given the responsibility to handle all immigration filings for the Diocese's foreign priests and nuns." Response at 19. According to Father McGuire, Lujan told him not to renew his visa in April, 2015, and that her I-360 filing on his behalf in October, 2015, "would keep him in status," even though only the I-485 performs this function. Response at 19. Father McGuire argues that, "[i]n taking 356 days to process the I-360, USCIS breached its nondiscretionary duty to him under the APA to render decisions in a reasonable time (5 U.S.C. § 555(b)) and under 8 U.S.C. § 2155(k)(2) to render decisions within 180 days." Response at 20 (citing Forest Guardians v. Babbitt, 174 F.3d 1178, 1190 (10th Cir. 1999); Kim v. USCIS, 551 F. Supp. 2d 1258, 1264-65 (D. Colo. 2008)(Miller, J.); Linville v. Barrows, 489 F. Supp. 2d 1278, 1282 (W.D. Okla. 2007)(Russell, J.); Yu v. Brown, 36 F. Supp. 2d 922, 928-35 (D.N.M 1999)(Vazquez, J.)). Father McGuire also argues that 8 C.F.R. § 245.1(d)(2)(i) does not apply to his case. See Response at 19 n.10.

Father McGuire then rebuts the Defendants' Count 3 arguments from the Partial MTD. See Response at 21. He argues that "USCIS misunderstands what claim three is about." Response at 21. Ineffective assistance is not a separate cause of action, according to Father McGuire, but instead informs the "through no fault of his own" language in 8 U.S.C. § 1255(c)(2). Response at

21. Father McGuire argues that 8 U.S.C. § 1255(c)(2) statutorily recognizes Board of Immigration Appeals cases involving ineffective assistance, and his claims are not Due Process Claims under the Fifth Amendment.  <u>See</u> Response at 21.

Father McGuire then turns to Count 4 and argues that equitable tolling applies, "because the allotted statutory time period expired through the fault of Defendants."  Response at 22.  He contends that the Defendants "build their entire argument on a single authority: *Black's Law Dictionary.*"  Response at 22.  <u>See id.</u> at 23.  Father McGuire notes that <u>Black's Law Dictionary</u> provides an alternate "equitable tolling" definition: "'A court's discretionary extension of a *legal deadline* as a result of extraordinary circumstances that prevented one from complying despite reasonable diligence throughout the period before the deadline passed.'"  Response at 23 (quoting <u>Black's Law Dictionary</u> ("Equitable Tolling")(10th ed. 2014)(emphasis in Response)).  He reiterates why he could not comply with 8 U.S.C. 1255(k)(2)(A) even though he exercised reasonable diligence.  Father McGuire also argues that 8 U.S.C. § 1255(k)(2)(A) "*is* a statute of limitations," Response at 25 (emphasis in original), and that the Defendants are wrong that "the statute of limitations for *bringing a federal action*, 28 U.S.C. § 2401(a), somehow preempts the statute of limitations for Father McGuire's *filing an adjustment application*, 8 U.S.C. § 1255(k)(2)(A)," Response at 25-26 (citing <u>Socop v. INS</u>, 272 F.3d 1176, 1193 (9th Cir. 2001)(en banc); <u>Moreno-Gutierrez v. Napolitano</u>, 794 F. Supp. 2d 1207 (D. Colo. 2011)(Martinez, J.)).  Father McGuire then discusses "what equitable tolling is and why it is applicable to this case."  Response at 26.  <u>See id.</u> at 26-27.  He asserts that 8 U.S.C. § 1255(k)(2)(A) is a statute of limitations rather than a statute of repose which parties cannot toll.  <u>See</u> Response at 27-28.  He concludes by arguing that equitable tolling is a tool to "determine the meaning of 'statutory language'" and not just a tool that a court of equity can employ.  Response at 29.

Father McGuire addresses the APA, Due Process, and Equal Protection Clause arguments last.  See Response at 30.  He argues that his Equal Protection Clause claim is more properly defined as a "'class-of-one'" claim, Response at 31 (quoting Kan. Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1216 (10th Cir. 2011)), and this claim's legal test is "whether Defendants had a rational basis for processing his I-360 differently," Response at 31.  He asserts that he was "likely in the worst-delayed one percent compared to other I-360s" and that there "is no 'reasonably conceivable state of facts that could provide a rational basis for the [one percentile] classification.'"  Response at 32 (quoting Wasatch Equality v. Alta Ski Lifts Co., 55 F. Supp. 3d 1351, 1366 (D. Utah 2014)(Benson, J.)(alteration in Response)).  Father McGuire contends that, while the Defendants argue that some applications necessarily take longer than others, his processing time was extraordinarily long and that I-360s were processed for other Diocese priests much faster.  See Response at 32-33.  The Defendants' argument against this claim, Father McGuire says, "ignores the great volume of case law analyzing in various contexts whether prolonged agency processing times were reasonable or not."  Response at 33.

Father McGuire then challenges the Defendants' argument that he cannot seek review of Immigration Services approval of the Diocese's I-360 petition.  See Response at 33.  He contends that "the processing of the I-360 cannot be outside the permissible scope of this lawsuit," because his appeals include arguments concerning the I-360 processing delay.  Response at 33.  He cites cases suggesting that visa petition beneficiaries have standing to challenge their denials.  See Response at 34 (citing Mantena v. Johnson, 809 F.3d 721 (2d Cir. 2015); Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Security, 783 F.3d 156, 164 (3d Cir. 2015); Patel v. USCIS, 732 F.3d 633, 638 (6th Cir. 2013)).  Regarding the Defendants' argument that there is no live case or controversy here, that Father McGuire has not suffered a legal wrong, and that the

Court cannot grant relief under 5 U.S.C. § 706(1), Father McGuire asserts that "[t]he delay in processing the I-360 is in this case because of its obvious relevance to why Father McGuire's lawful status lapsed." Response at 35.

On the Due Process claims, Father McGuire argues that 8 U.S.C. § 1255(k) and 8 C.F.R. § 245.2(a)(2)(i)(B) "imposed a duty on USCIS to adjudicate the I-360 within six months of its receipt or at least to adjudicate it in a reasonable period of time." Response at 35. He states that Immigration Services has a stated policy goal to process all applications within six months and that Father McGuire's ultimate processing time was five months longer than the time it takes Immigration Services to process ninety-three percent of applications. See Response at 35-36. He states that, "but for USCIS' violations of 8 U.S.C. §§ 1255(c)(2) and 1255(k)(2) (as well as 8 C.F.R. § 245.1(d)(2)(ii)), Father McGuire would now be a lawful permanent resident." Response at 37. Father McGuire argues that under Mathews v. Eldridge, 424 U.S. 319, 333 (1976), he has stated a claim for a due process violation. See Response at 37-38. Father McGuire's concluding argument is that, because Immigration Services denied his adjustment application and motion to reconsider on statutory grounds, and because Immigration Services "*would have granted the application and motion were it not for their (wrongly) finding statutory violations*," Response at 38 (emphasis in original), "he has a property interest in adjustment of status just like he would have a property interest in any other statutory benefit," Response at 38.

4.      **The Reply**.

The Defendants reply and reiterate that the Court should dismiss all Father McGuire's claims other than Count 2. See Reply in Support of Partial Motion to Dismiss at 1-3, filed May 22, 2018 (Doc. 33)("Reply"). The Defendants first argue that Father McGuire does not cite any authority for asserting that ineffective assistance is a cognizable cause of action separate from his

APA claim under 5 U.S.C. § 706(2)(a).  See Reply at 3.  According to the Defendants, "[a]rguing

that his failure to maintain lawful status really was the fault of another as a factual matter is simply

not responsive" to this point.  Reply at 4.  The Defendants state that Father McGuire's argument

that his ineffective assistance claim is statutorily recognized "seems like an admission that Count

3 does not contain a separate cause of action, but rather repeats the claim in Count 2 that USCIS

violated the APA by not properly applying 8 U.S.C. § 1255(c)(2)."  Reply at 4.

    The Defendants then argue that the Court should dismiss Count 4, because Father McGuire

does not provide any authority supporting the proposition that equitable tolling is a cause of action.

See Reply at 4-5.  They also argue that Father McGuire does not adequately respond to their

assertion that Immigration Services must apply 8 U.S.C. § 1255(c)(2) as written rather than in an

equitable manner.  See Reply at 5 (citing McQuiggin v. Perkins, 569 U.S. 383, 409 (2013)(Scalia,

J., dissenting)).  The Defendants contend that, because "Congress has clearly provided" that the

safe harbor is 180 days, neither Immigration Services nor the Court may ignore this clear mandate.

Reply at 6.  They further argue that 9 U.S.C. § 1255(k)(2)(A) is not a statute of limitations, because

it "does not bar any claim or create a time limitation on seeking judicial or administrative review."

Reply at 7.  The Defendants also note that Father McGuire does not respond to their argument that

equitable tolling applies only where a party fails to pursue a claim for reasons beyond his control

and that ignorance of the law is not an excuse.  See Reply at 7-8.

    The Defendants then turn to Count 1.  See Reply at 8.  They argue that Father McGuire

does not respond to their arguments that the Court cannot grant Father McGuire relief, because

Immigration Services already has approved his I-360 application, and because Father McGuire did

not suffer "a legal wrong or injury as a result of this *approval*."  Reply at 9 (emphasis in original).

They reiterate that the Court "cannot compel USCIS to act because it has *already acted*." Reply at 9 (emphasis in original).

The Defendants also argue that the Complaint's facts do not suggest a claim under the Due Process or Equal Protection Clauses. See Reply at 10. They dispute that 8 U.S.C. § 1255(k)(2) creates a duty on Immigration Services' part to resolve claims in six months and that the stated goals on Immigration Services' website "give rise to a constitutional requirement." Reply at 11. The Defendants argue that "courts have never entertained challenges, under the rational basis, in which there is no classification and plaintiff is simply asking the court to oversee an agency's operations and processes." Reply at 12. Further, they assert that the United States Court of Appeals for the Tenth Circuit has expressed hesitancy about "class of one" Equal Protection claims. Reply at 12 (citing Jennings v. City of Stillwater, 383 F. 3d 1199, 1210-11 (10th Cir. 2004)). They argue that Father McGuire has not met the Tenth Circuit's requirements for these sorts of claims. See Reply at 13 (citing Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1216). The Defendants then contend that Due Process claims cannot ask for, as relief, court orders improving agency procedures. See Reply at 14. They conclude by stating that Immigration Services created an administrative process to address the unfortunate situation in which Father McGuire finds himself, but that Lujan, Father McGuire, and the Diocese "simply did not avail themselves of that process." Reply at 14.

5.      **The Notice.**

Father McGuire filed a notice containing additional authorities for the Court to consider. See Plaintiff's Notice of Supplemental Authorities, filed May 30, 2018 (Doc. 34)("Notice"). In the Notice, Father McGuire states that the additional cases he cites "are significant and pertinent to Plaintiff's Claim Three." Notice at 1. Father McGuire cites four additional cases:

*Evangelista v. Johnson*, Civ. No. 14-13195, 2015 WL 12683978, at *4-6 (D. Mass. Oct. 30, 2015)(holding that USCIS's interpretation of 8 U.S.C. § 1255(c)(2)'s "through-no-fault-of-his-own" language in 8 C.F.R. § 245.1(d)(2)(i)'s inaction-of-another-individual language is impermissibly narrow and contrary to law), citing *Wong v. Napolitano*, No. CF-08-937-ST, 2010 WL 916274, at *14-15 (D. Or. March 10, 2010); *Alimoradi v. USCIS*, No. CV 08-02529, 2009 WL 8633619, at *5-6 (C.D. Cal. Feb. 10, 2009); *Mart v. Beebe*, No. CIV 99-1391, 2001 WL 13624, at *5 (D. Or. Jan. 5, 2001).

Notice at 1.

### 6.       The September 6, 2018, Hearing.

The parties argued the Partial MTD before the Court on September 6, 2018. <u>See</u> Transcript of Hearing (taken September 6, 2018)("Tr.").[5]  The Defendants first clarified that they are asking the Court to dismiss Count 1, Count 3, and Count 4, but to leave Count 2. <u>See</u> Tr. at 4:1-6 (Court, Girdharry).  The Defendants then asserted that "[t]here is no meaningful relief that the Court can grant" Father McGuire under Count 1, Tr. at 4:22-23 (Girdharry), that "there is no such cause of action against the government entitled ineffective assistance by another individual," under Count 3, Tr. at 6:9-11 (Girdharry), and that the doctrine of equitable tolling is inapplicable to this case, <u>see</u> Tr. at 6:11-22 (Girdharry).  Asked if Father McGuire was possibly raising equitable tolling for another reason, the Defendants responded that its Partial MTD was simply seeking to clean up the case "and narrow the focus for the Court." Tr. at 7:14-15 (Girdharry).  The Defendants also argued that the Court must dismiss Father McGuire's Due Process claims, because there is no liberty or property interest "in obtaining something that is provided under the agency's discretion." Tr. at 8:1-2 (Girdharry)(citing <u>Hernandez v. Holder</u>, 450 F. App'x 773).  The Defendants concluded by requesting that the Court "dismiss all claims extraneous to the APA cause of action and permit the

---

[5]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

parties to enter into a briefing schedule to address the merits of that cause of action." Tr. at 9:3-6 (Girdharry).

Father McGuire then argued his case. See Tr. at 9:13. He cited <u>Olenhouse v. Commodity Credit Corp.</u>, 42 F.3d 1560 (10th Cir. 1994), and argued that the APA is not a jurisdictional statute and that "one can raise constitutional claims within the APA context if challenging final agency action." Tr. at 10:9-11 (Howard). He also argued that "even the Tenth Circuit in <u>Olenhouse</u> has recognized that a district court complaint can initiate an action under the APA." Tr. at 10:18-20 (Howard). Father McGuire stated that, in contrast to <u>Jarita Mesa Livestock Grazing Association v. U.S. Forest Service.</u>, 58 F. Supp. 3d 1191 (D.N.M. 2014)(Browning, J.), "the review here is on the record." Tr. at 11:13-14 (Howard). While Father McGuire recognized "a basic misunderstanding . . . of how one is to express an APA claim," he argued that filing a district court complaint is permissible under <u>Olenhouse v. Commodity Credit Corp.</u>, Tr. at 12:15-17 (Howard).

Father McGuire and the Court then discussed his current immigration status. See Tr. at 13:5-15:1 (Court, Howard). Father McGuire said that there was no current emergency, but he would let the Court know if one arose. See Tr. at 15:2-9 (Court, Howard). He then summarized the case's facts, see Tr. at 15:13-20:18 (Howard), and explained why he filed both a motion to reconsider and a motion to reopen, see Tr. at 20:18-21:5 (Howard). Father McGuire asserted that Immigration Services' decision denying his motion to reconsider "is extremely confusing. It cites the wrong reg[ulation] for the wrong declaration, makes no reference to equitable tolling argument." Tr. at 21:16-18 (Howard).

Father McGuire turned to the case's relevant statutes, and he explained 8 U.S.C. § 1255(k)(2)'s and (c)(2)'s functions. See Tr. at 21:25-22:22. (Howard). He stated that he did not understand why the Defendants did not think that he had stated a claim in Count 3, which is

based on 8 U.S.C. § 1255(c)(2), because in their brief they said that the Court could dismiss Count 3, and Father McGuire could still make the same argument in Count 2.  <u>See</u> Tr. at 22:22-23:16 (Howard).  Father McGuire argued that this assertion is not true, because Count 2 and Count 3 are based on the statute's different parts.  <u>See</u> Tr. at 23:16-17 (Howard).

He then noted that four cases cited in his Notice have invalidated 8 C.F.R. § 245.1(d)(2)(i) as impermissibly narrow, <u>see</u> Tr. at 23:22-24:19 (Howard), and that "we think they are very persuasive," Tr. at 25:23-24 (Howard).  He then stated that "[w]hat happened in those cases happened here," because Father McGuire relied on Lujan to provide advice, and because of this reliance Immigration Services ultimately denied his application through no fault of his own.  Tr. at 24:20.  <u>See</u> <u>id.</u> at 24:20-25:22 (Howard).  According to Father McGuire, 8 C.F.R. § 245.1(d)(2)(i) does not reflect Congress' intent, because the statute "simply said through no fault of his own," but Immigration Services adds three specific elements that a claimant had to satisfy. Tr. at 26:1-2 (Howard).  Whether Lujan satisfies the first element of Immigration Services' regulation "is not clear," Tr. at 26:12 (Howard).  Father McGuire argued, in any case, that the regulation is an improper reading of the statute.  <u>See</u> Tr. at 26:6-19 (Howard).  Father McGuire then argued that Immigration Services "confused" the regulations in its denial of his motion to reconsider and motion to reopen.  Tr. at 26:20 (Howard).

Father McGuire then addressed his equitable tolling argument.  <u>See</u> Tr. at 29:7.  He began by noting that Immigration Services does not address this argument as it denied his motion for reconsideration.  <u>See</u> Tr. at 29:11-16 (Howard).  Father McGuire also stated that the Tenth Circuit has held that a party must satisfy three different elements before a court may exercise its discretion to extend a legal deadline.  <u>See</u> Tr. at 30:1-10 (Howard).  All three elements are satisfied here, according to Father McGuire, because he learned about the limitation period after he discovered

the injury, his situation constitutes "extraordinary circumstances," and he otherwise exercised reasonable diligence. Tr. at 30:22-23 (Howard). See id. at 30:11-31:20 (Howard). Father McGuire also reiterated his arguments that 28 U.S.C. § 2401(a) does not preempt 8 U.S.C. § 1255(k)(2)(A), see Tr. at 32:20-33:21 (Howard)(citing Socop v. INS, 272 F.3d 1176; Moreno-Gutierrez v. Napolitano, 794 F. Supp. 2d 1207), and that courts may use equitable tolling to discern legislative intent and not merely as a tool to achieve a just outcome, see Tr. at 33:24-34:3 (Howard). Father McGuire also argued that the Defendants should not be able to raise post hoc rationalizations concerning equitable tolling. See Tr. at 34:4-9 (Howard).

Father McGuire then addressed his Count 1 claim. See Tr. at 34:10 (Howard). He conceded that he did not know of any pernicious discrimination, but argued that he was treated differently than other applicants and that he is therefore a class of one. See Tr. at 34:13-16 (Howard). Father McGuire then noted that he never received an explanation for the delay. See Tr. at 35:5 (Howard). He argued that, while the Defendants think that the I-360 "is irrelevant to this case," "our response is it's everything in this case." Tr. at 35:7-9 (Howard). Father McGuire said that he is not challenging the I-360 approval, but he is using the I-360 to argue that Immigration Services improperly denied his I-485 application. See Tr. at 35:10-22 (Howard). For his Due Process claim, Father McGuire directed the Court to footnote 34 in the Response and said that many district courts have held that they have jurisdiction to consider constitutional claims in APA challenges. See Tr. at 36:4-8 (Howard). Further, he argued that this case concerns a statutory denial rather than a discretionary denial, and the Court therefore has jurisdiction. See 36:9-18 (Howard).

The Defendants responded. See Tr. at 37:1. The Defendants first argued that Father McGuire's arguments "[c]learly go to the merits [of the] agency's decision here and that just

basically takes us back to the starting point of this case." Tr. at 37:4-6 (Girdharry). The Defendants said that Father McGuire argued that all of his claims are extraneous to the APA claim for judicial review. See Tr. at 38:2-4 (Girdharry). Further, the Defendants stated that Olenhouse v. Commodity Credit Corp. is "not confusing," Tr. at 38:7 (Girdharry), and explained what it calls for in a case like Father McGuire's, see Tr. at 38:8-39:7 (Girdharry). The Defendants also characterized its equitable tolling argument as "responding to plaintiff's allegations," rather than as post hoc rationalizations. Tr. at 39:12-13 (Girdharry). On Father McGuire's Equal Protection claim, the Defendants asserted that Father McGuire fails to make the required threshold showing that Immigration Services treated him differently than other visa-applicants, because immigration visa applications always concern different facts. See Tr. at 39:22-40:16 (Girdharry). The Defendants concluded by stating again that Father McGuire's claims should proceed under 5 U.S.C. § 7062 and that "all of [Father McGuire's] claims are inside of the APA box." Tr. at 41:24-25 (Girdharry). See Tr. at 40:25-41:25 (Girdharry).

The parties next disputed the correct remedy in this case. See Tr. at 43:8-48:3 (Court, Girdharry, Howard). The Defendants argued that the only correct remedy is remand to the agency. See Tr. at 43:10-12 (Girdharry). Father McGuire argued that the Court could remand the case, it could "remand with instructions in light of [the] courts' finding that the following conclusions of law should be adhered to," Tr. at 44:15-17 (Howard), or it could make a ruling on the record's basis, see Tr. at 44:24-45:9 (Howard). Father McGuire clarified that he is not seeking damages. See Tr. at 45:17-22 (Court, Howard). He stated that he wants the Court to order: "[I]t is ordered that . . . Father McGuire be entitled or be allowed to proceed with his adjustment application based on the Court's determination that he is statutor[il]y eligible to do so." Tr. at 46:3-6 (Howard). The Defendants argued that the Supreme Court has stated that the proper remedy in cases such as this

one is to remand APA actions to the agency with instructions consistent with the court's order, because the court does not have the authority to issue visas or do other similar administrative work. See Tr. at 46:17-47:7 (Girdharry)(citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729 (1985)). The Defendants also stated that this same remedy would apply to the Court's review of Immigration Services' reconsideration denial.  See Tr. at 49:1 (Girdharry).

In response to a question from the Court, the Defendants stated that the cases that Father McGuire identifies in the Notice "go to whether or not the agency's regulation was either improperly applied, or the regulation itself is invalid."  Tr. at 50:6-8 (Girdharry).  The Defendants argued that any challenge to the regulation "again falls under the APA," because sovereign immunity protects the United States from other claims.  Tr. at 50:9 (Girdharry).  They agreed that "everything that's being raised in Count 3 can be raised as theories as to why the agency did not act properly."  Tr. at 50:23-25 (Court).

Father McGuire argued again that he continued "to see no difference between claim 2 and claim 3."  Tr. at 52:2-3 (Howard).  He said that he pled Count 3, because "it's a different part of the statute."  Tr. at 52:6-7 (Howard).  He argued again that, under Olenhouse v. Commodity Credit Corp., he can "still proceed with the complaint and still argue APA claims."  Tr. at 53:2-3 (Howard).  Given the last word, the Defendants argued that allowing Count 3 "to proceed against the Government claiming that framing a cause of action called ineffective assistance by another individual . . . would have a very negative effect on litigation against the Government."  Tr. at 53:19-23 (Girdharry).  They concluded that "all this court needs to decide is whether or not the agency's decision denying plaintiff's I-485 application if is arbitrary [or] capricious."  Tr. at 54:12-15 (Girdharry).

      **7.**       **The APA Brief.**

After the hearing, Father McGuire filed another brief regarding whether he "seeks judicial review of final agency action 'outside' the Administrative Procedure Act." Plaintiff's Post-Hearing Brief, filed October 4, 2018 (Doc. 45)("APA Brief")(quoting Clerk's Minutes at 1, filed September 6, 2018 (Doc. 40)). He states that "language he added in the First Amended Complaint places Claims One, Three and Four *squarely inside* the APA." APA Brief at 1. He argues that, by adding the phrase "Defendants' actions, findings, and conclusions are arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law, pursuance to the Administrative Procedure Act" to each claim, he has "rendered moot the Government's apparent argument " that his claims "were defective for not reciting the APA." APA Brief at 3.

Father McGuire notes that the Defendants assert that his claims are not "'cognizable.'" APA Brief at 4 (quoting Partial MTD at 4, n.3). He argues that this word means that the Defendants do "not think the claim is 'plausible.'" APA Brief at 4 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). Father McGuire asserts that the Defendants "cannot concede that Claim Three is an APA claim but not One and Four." APA Brief at 5. He contends that their "on-again, off-again argument that the Amended Complaint pleads free-standing, non-APA claims is obviously mistaken and wastes this Court's time and Father McGuire's meager resources." APA Brief at 5. He argues that the Complaint asserts plausible claims that Immigration Services' decisions were arbitrary and capricious. See APA Brief at 6 (citing Olenhouse v. Commodity Credit Corp., 42 F.3d at 1573).

Next, Father McGuire addresses the Defendants' argument that his First, Third, and Fourth Counts are "'outside the APA' simply because Father McGuire has proceeded by way of complaint than by way of petition for review." APA Brief at 6 (quoting Clerk's Minutes at 1 (Doc. 40)). He states that Olenhouse v. Commodity Credit Corp. explicitly prohibits summary judgment based on

arguments, documents or other evidence outside the administrative record.  See APA Brief at 6-7.

Father McGuire argues, however, that parties may still appeal agency action with either complaints

or petitions for review.  See APA Brief at 7-8 (citing Forest Guardians v. U.S. Fish & Wildlife

Serv., 611 F.3d at 702; Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy,

485 F.3d 1091, 1095 (10th Cir. 2007)).  He then quotes an extensive excerpt from Jarita Mesa

Livestock Grazing Association v. U.S. Forest Service, 305 F.R.D. at 272-73, in which the Court

reached a similar conclusion.  APA Brief at 8-9.  Father McGuire notes that his complaint merely

seeks APA review of Immigration Services' decision, does not seek discovery or a trial, and wants

review only on the administrative record.  See APA Brief at 9.  Finally, Father McGuire discusses

the remedies he seeks from the Court, see APA Brief at 9-10, and concludes that "[n]othing there

runs counter to this being solely an APA-review case," APA Brief at 10.

### 8. __The APA Brief Response.__

The Defendants file a Response to argue again that Father McGuire's Claim Two "is the

only viable claim in this case."  The Government's Response to Plaintiff's Post-Hearing Brief at

1, filed October 18, 2018 (Doc. 46)("APA Brief Response").  The Defendants argue that, because

there is no reason why Immigration Services "can be held liable for the alleged ineffective

assistance of another individual with regard to an alien's filing of an application for immigration

benefits," Father McGuire's Claim Three is "neither *plausible*, nor *cognizable*."  APA Brief

Response at 2 (emphasis in original).  The Defendants make the same argument regarding Father

McGuire's Claim Four.  See APA Brief Response at 2-3.  Regarding Father McGuire's first claim,

the Defendants argue that there is no cause of action for a benefits application that Immigration

Services "*has already approved*," and Father McGuire is only challenging the denial of his I-485

application.  APA Brief at 3 (emphasis in original).  Finally, the Defendants assert that "it has long

been established that the only remedy available to Plaintiff in this case is remand back to the agency." APA Brief at 3 (citing <u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. at 744).

**9.      The February 5, 2020, Hearing.**

The Court held a status conference on February 5, 2020. <u>See</u> Clerk's Minutes at 1, filed February 5, 2020 (Doc. 53). Father McGuire noted that, with his residency status in limbo, if he were to leave the country, "he could not do so without abandoning or at least without having great difficulty trying to reenter the United States." Transcript of Hearing (taken February 5, 2020)("Feb. Tr.") at 4:8-10 (Howard).[6] The Court confirmed that the pending Memorandum Opinion and Order would help the parties to resolve the case. <u>See</u> Feb. Tr. at 5:4-6:4 (Court, Howard). The parties expressed a preference to wait for the Memorandum Opinion and Order rather than to set up a briefing schedule. <u>See</u> Tr. at 6:17-19 (Howard); 7:17-21 (Goldsmith).

## <u>LAW REGARDING JUDICIAL REVIEW OF AGENCY ACTION</u>

Under the APA,

[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, that any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent

_____

[6]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 702. The APA states that district courts can:

(1)     compel agency action unlawfully withheld or unreasonably delayed; and

(2)     hold unlawful and set aside agency action, findings, and conclusions found to be--

    (A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    (B)     contrary to constitutional right, power, privilege, or immunity;

    (C)     in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    (D)     without observance of procedure required by law;

    (E)     unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    (F)     unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.

    Under Olenhouse v. Commodity Credit Corp., "[r]eviews of agency action in the district courts [under the APA] must be processed as appeals. In such circumstances the district court should govern itself by referring to the Federal Rules of Appellate Procedure." 42 F.3d at 1580. See Wildearth Guardians v. U.S. Forest Serv., 668 F. Supp. at 1323. "As a group, the devices appellate courts normally use are generally more consistent with the APA's judicial review scheme than the devices that trial courts generally use, which presume nothing about the case's merits and divide burdens of proof and production almost equally between the plaintiff and defendant." Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Service, 305 F.R.D. at 272.

1.      **Reviewing Agency Factual Determinations.**

Under the APA, a reviewing court must accept an agency's factual determinations in informal proceedings unless they are "arbitrary [or] capricious," 5 U.S.C. § 706(2)(A), and its factual determinations in formal proceedings unless they are "unsupported by substantial evidence," 5 U.S.C. § 706(2)(E). The APA's two linguistic formulations amount to a single substantive standard of review. See Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d 677, 683-84 (D.C. Cir. 1984)(Scalia, J.)(explaining that, as to factual findings, "there is no *substantive* difference between what [the arbitrary or capricious standard] requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense" (emphasis in original)). See also id. at 684 ("[T]his does not consign paragraph (E) of the APA's judicial review section to pointlessness. The distinctive function of paragraph (E) -- what it achieves that paragraph (A) does not -- is to require substantial evidence to be found *within the record of closed-record proceedings* to which it exclusively applies." (emphasis in original)).

In reviewing agency action under the arbitrary-or-capricious standard, a court considers the administrative record -- or at least those portions of the record that the parties provide -- and not materials outside of the record. See 5 U.S.C. § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party."); Fed. R. App. P. 16 ("The record on review or enforcement of an agency order consists of . . . the order involved; . . . any findings or report on which it is based; and . . . the pleadings, evidence, and other parts of the proceedings before the agency."); Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Reserve Sys., 745 F.2d at 684 ("[W]hether the administrator was arbitrary must

be determined on the basis of what he had before him when he acted.").  See also Franklin Sav.

Ass'n v. Dir., Office of Thrift Supervision, 934 F.2d 1127, 1137 (10th Cir. 1991)("[W]here

Congress has provided for judicial review without setting forth . . . procedures to be followed in

conducting that review, the Supreme Court has advised such review shall be confined to the

administrative record and, in most cases, no de novo proceedings may be had.").  Tenth Circuit

precedent indicates, however, that the ordinary evidentiary rules regarding judicial notice apply

when a court reviews agency action.  See New Mexico ex rel. Richardson v. Bureau of Land

Mgmt., 565 F.3d 683, 702 n.21 (10th Cir. 2009)(citing Fed. R. Evid. 201(b))("We take judicial

notice of this document, which is included in the record before us in [another case]."); id. at 702

n.22.  In contrast, the United States Courts of Appeals for the Ninth and Eleventh Circuits have

held that taking judicial notice is inappropriate in APA reviews absent extraordinary circumstances

or inadvertent omission from the administrative record.  See Compassion Over Killing v. U.S.

Food & Drug Admin., 849 F.3d 849, 852 n.1 (9th Cir. 2017); Nat'l Min. Ass'n v. Sec. of U.S.

Dep't of Labor, 812 F.3d 843, 875 (11th Cir. 2016).

To fulfill its function under the APA, a reviewing court should engage in a "thorough,

probing, in-depth review" of the record before it when determining whether an agency's decision

survives arbitrary-or-capricious review.  Wyoming v. United States, 279 F.3d 1214, 1238 (10th

Cir. 2002)(citation omitted).  The Tenth Circuit explains:

> In determining whether the agency acted in an arbitrary and capricious manner, we
> must ensure that the agency decision was based on a consideration of the relevant
> factors and examine whether there has been a clear error of judgment. We consider
> an agency decision arbitrary and capricious if the agency relied on factors which
> Congress had not intended it to consider, entirely failed to consider an important
> aspect of the problem, offered an explanation for its decision that runs counter to
> the evidence before the agency, or is so implausible that it could not be ascribed to
> a difference in view or the product of agency expertise.

Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999).  Arbitrary-or-capricious

review requires a district court "to engage in a substantive review of the record to determine if the agency considered relevant factors and articulated a reasoned basis for its conclusions," Olenhouse, 42 F.3d at 1580, but it is not to assess the wisdom or merits of the agency's decision, see Colo. Envtl. Coal. v. Dombeck, 185 F.3d at 1172. The agency must articulate the same rationale for its findings and conclusions on appeal upon which it relied in its internal proceedings. See SEC v. Chenery Corp., 318 U.S. 80 (1943). While the court may not supply a reasoned basis for the agency's action that the agency does not give itself, the court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)(internal citations omitted).

## 2. **Reviewing Agency Legal Interpretations.**

In promulgating and enforcing regulations, agencies must interpret federal statutes, their own regulations, and the Constitution of the United States of America, and Courts reviewing those interpretations apply three different deference standards, depending on the kind of law at issue. First, the federal judiciary accords considerable deference to an agency's interpretation of a statute that Congress has tasked it with enforcing. See United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug, 22 F.3d 235, 238 (10th Cir. 1994). This is known as Chevron deference, named after the seminal case, Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc., 467 U.S. 837 (1984)("Chevron"). [7] Chevron deference is a two-step

_____

[7]The case itself is unremarkable, uninstructive, does not explicitly outline the now-familiar two-step process of applying Chevron deference, and does not appear to have been intended to become a "big name" case at all. Its author, the Honorable John Paul Stevens, former Associate Justice of the Supreme Court, insists that the case was never intended to create a regime of deference, and, in fact, Justice Stevens became one of Chevron deference's greatest detractors in subsequent years. See generally Charles Evans Hughes, Justice Stevens and the Chevron Puzzle, 106 Nw. U. L. Rev. 551 (2012).

process[8] that first asks whether the statutory provision in question is clear and, if it is not, then asks

whether the agency's interpretation of the unclear statute is reasonable.  See Maralex Resources,

Inc. v. Barnhardt, 913 F.3d 1189 1198-99 (10th Cir. 2019).  As the Tenth Circuit has explained,

> we must be guided by the directives regarding judicial review of administrative
> agency interpretations of their organic statutes laid down by the Supreme Court in
> *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 . . .
> (1984).  Those directives require that we first determine whether Congress has
> directly spoken to the precise question at issue.  If the congressional intent is clear,
> we must give effect to that intent.  If the statute is silent or ambiguous on that
> specific issue, we must determine whether the agency's answer is based on a
> permissible construction of the statute.

United States v. Undetermined Quantities of Bottles of an Article of Veterinary Drug, 22 F.3d at

238 (citation omitted).

A number of policy considerations animate Chevron deference, among them: (i) statutory

interpretation, i.e., that Congress, by passing extremely open-ended and vague organic statutes,

grants discretionary power to the agencies to fill in the statutory gaps; (ii) institutional competency,

i.e., that agencies are more competent than the courts at filling out the substantive law in their

field; (iii) political accountability, i.e., that agencies, as executive bodies ultimately headed by the

President of the United States of America, can be held politically accountable for their

---

[8]There is, additionally, a threshold step -- the so-called step zero -- which asks whether Chevron deference applies to the agency decision at all.  See Cass R. Sunstein, Chevron Step Zero, 92 Va. L. Rev. 187 (2006).  Step zero asks: (i) whether the agency is Chevron-qualified, meaning whether the agency involved is the agency charged with administering the statute -- for example, the EPA administers a number of statutes, among them the Clean Air Act, Pub. L. No. 88-206, 77 Stat. 392; (ii) whether the decision fits within the category of interpretations afforded the deference -- interpretation of contracts, the Constitution, and the agency's own regulations are not afforded Chevron deference, see, e.g., U.S. West, Inc. v. FCC, 182 F.3d 1224 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to *Chevron* deference."); and (iii) whether Congress intended the agency to "speak with the force of law" in making the decision in question, United States v. Mead Corp., 533 U.S. 218, 229 (2001) -- opinion letters by the agency, for example, do not speak with the force of law and are thus not entitled to Chevron deference, see Christensen v. Harris Cty., 529 U.S. 576 (2000).  An affirmative answer to all three inquiries results in the agency's decision passing step zero.

interpretations; and (iv) efficiency, i.e., that numerous, subject-matter specialized agencies can more efficiently promulgate the massive amount of interpretation required to maintain the modern regulatory state -- found in the Code of Federal Regulations and other places -- than a unified but Circuit-fragmented federal judiciary can.

When agencies interpret their own regulations -- to, for example, adjudicate whether a regulated party followed them -- courts accord agencies what is known as Auer or Seminole Rock deference. See Auer v. Robbins, 519 U.S. 452 (1997)("Auer"); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945). This deference is applied in the same manner as Chevron deference and is substantively identical. The Court has previously expressed its concerns about Auer deference. See, e.g., Mohon v. Agentra, 400 F. Supp. 3d 1189, 1221-25 (D.N.M. 2019); Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Service, 305 F.R.D. at 286-89. The Supreme Court recently addressed whether it should overrule Auer deference in Kisor v. Wilkie, 139 S. Ct. 2400, 2408 (2019). Although the Supreme Court declined to overrule Auer, the majority opinion took pains to "reinforce its limits." 139 S. Ct. 2408. The Court noted that Auer deference is appropriate "only if a regulation is genuinely ambiguous," "even after a court has resorted to all the standard tools of interpretation." 139 S. Ct. 2414. To earn deference in this scenario, the agency's interpretation must still be "'reasonable.'" 139 S. Ct. at 2415 (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 515 (1994)). Auer deference is also "'unwarranted'" "when a court concludes that an interpretation does not reflect an agency's authoritative, expertise-based 'fair, [or] considered judgment.'" 139 S. Ct. at 2414 (quoting Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 155 (2012)). Deference is therefore not appropriate where the regulatory interpretation is not "the agency's 'authoritative' or 'official position,' rather than any more ad hoc statement not reflecting the agency's views," 139 S. Ct. at 2416 (quoting United States v. Mead

Corp., 533 U.S. 218, 257-59 (2001)(Scalia, J., dissenting)), does not "in some way implicate [the agency's] substantive expertise," 139 S. Ct. at 2417, or is a convenient, post hoc rationalization to defend past agency action, see 139 S. Ct. at 2417.

Last, courts afford agencies no deference in interpreting the Constitution.  See U.S. West, Inc. v. FCC, 182 F.3d 1224, 1231 (10th Cir. 1999)("[A]n unconstitutional interpretation is not entitled to Chevron deference. . . .  [D]eference to an agency interpretation is inappropriate not only when it is conclusively unconstitutional, but also when it raises serious constitutional questions." (citing, e.g., Rust v. Sullivan, 500 U.S. 173, 190-91 (1991))).  Courts have superior competence in interpreting -- and constitutionally vested authority and responsibility to interpret -- the Constitution's content.  The presence of a constitutional claim does not take a court's review outside of the APA, however -- § 706(2)(B) specifically contemplates adjudication of constitutional issues -- and courts must still respect agency fact-finding and the administrative record when reviewing agency action for constitutional infirmities; they just should not defer to the agency on issues of substantive legal interpretation.  See, e.g., Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d 1074, 1085 (10th Cir. 2006)("We review Robbins' [constitutional] due process claim against the [agency] under the framework set forth in the APA.").

**3.      Waiving Sovereign Immunity.**

The APA waives sovereign immunity with respect to non-monetary claims.  See 5 U.S.C. § 702.  The statute provides:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States:

5 U.S.C. § 702.  Claims for money damages seek monetary relief "to <u>substitute</u> for a suffered loss."

<u>Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.</u>, 554 F.3d 1290, 1298 (10th Cir.

2009)(emphasis in original).   Claims that do not seek monetary relief or that seek "specific

remedies that have the effect of compelling monetary relief" are not claims for monetary damages.

<u>Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.</u>, 554 F.3d at 1298.  To determine

whether a claim seeks monetary relief, a court must "look beyond the face of the complaint" and

asses the plaintiff's prime object or essential purpose; "'[a] plaintiff's prime objective or essential

purpose is monetary unless the non-monetary relief sought has significant prospective effect or

considerable value apart from the claim for monetary relief.'"  <u>Normandy Apartments, Ltd. v. U.S.</u>

<u>Dep't of Hous. & Urban Dev.</u>, 554 F.3d at 1296 (quoting <u>Burkins v. United States</u>, 112 F.3d 444,

449 (10th Cir. 1997)).

   The APA's sovereign immunity waiver for claims "seeking relief other than money

damages" does not apply, however, "if any other statute that grants consent to suit expressly or

impliedly forbids the relief which is sought."  5 U.S.C. § 702.  The Tucker Act, 28 U.S.C. §§ 1346,

1491, permits district courts to hear some claims against the United States, but it also states that

"district courts shall not have jurisdiction of any civil action or claim against the United States

founded upon any express or implied contract with the United States."  28 U.S.C. § 1346(a)(2).  It

follows that the APA does not waive the United States' sovereign immunity as to contract claims

even when those claims seek relief other than money damages, such as declaratory or injunctive

relief.  <u>See</u> <u>Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.</u>, 554 F.3d at 1295.

Consequently, two questions determine whether the APA waives the United States' sovereign

immunity as to a particular claim: "First, does [the] claim seek 'relief other than money damages,'

such that the APA's general waiver of sovereign immunity is even implicated?  Second, does the

Tucker Act expressly or impliedly forbid the relief that Normandy seeks, such that the APA's waiver does not apply?" Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev., 554 F.3d at 1296 (quoting 5 U.S.C. § 702).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.) (quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(alteration in Herrera v. Santa Fe Pub. Sch.)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 2:11CV00757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477

U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[9]  Once the movant meets this burden,

rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine

issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

(1986)("Liberty Lobby").  In American Mechanical Solutions, LLC v. Northland Piping, Inc., 184

F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the

defendant when the plaintiff did not offer expert evidence supporting causation or proximate

causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims.

See 184 F. Supp. 3d at 1075-78.  The Court reasoned that the plaintiff could prove neither the

breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-

merchantability claim's proximate-causation requirement with mere common knowledge, and so

New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the

plaintiff had not provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  The Court determined

that, without the requisite evidence, the plaintiff failed to prove "an essential element of the

nonmoving party's case," rendering "all other facts immaterial."  184 F. Supp. 3d at 1075 (internal

quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).  Thus,

if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant

may move, without any competent evidence itself, past the plaintiff's lack of competent evidence,

and secure summary judgment.  See, e.g., Celotex, 477 U.S. at 323-25 (providing that summary

judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech.

---

[9]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme
Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the
law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727,
at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent
both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how
the standard was applied to the facts of the case.").

Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor). A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence. See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim). See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259. See Abercrombie v. City of Catoosa,

896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation and internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249

(citations omitted).  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'"  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)(quoting <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  <u>Liberty Lobby</u>, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party.  <u>See</u> <u>Hunt v. Cromartie</u>, 526 U.S. 541, 550-55 (1999); <u>Liberty Lobby</u>, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)).  Fourth, the court cannot decide any issues of credibility.  <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In <u>Scott v. Harris</u>, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment is appropriate where video evidence quite clearly contradicted the plaintiff's version of the facts.  <u>See</u> 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than

simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting *Scott*, 550 U.S. at 380); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces).  "The Tenth Circuit, in *Rhoads v. Miller*,

[352 F. App'x 289 (10th Cir. 2009)] explained that the blatant contradictions of the record must

be supported by more than other witnesses' testimony."  Lymon v. Aramark Corp., 728 F. Supp.

2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012).

To allege a claim for relief, rule 8 of the Federal Rules of Civil Procedure requires a

pleading to contain

> (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
>
> (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8. Parties may allege new claims in motions for summary judgment. Evans v. McDonald's Corp., 936 F.2d at 1090-91. When this occurs, courts treat the motion for summary judgment as a request to amend the complaint pursuant to rule 15 of the Federal Rules of Civil Procedure. See Viernow v. Euripides Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998). The Tenth Circuit has stated that "[a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits." Evans v. McDonald's Corp., 936 F.2d at 1090-91 (quotation marks omitted). While the purpose of "fact pleading" is to give defendants fair notice of claims against them "without requiring the plaintiff to have every legal theory or fact developed in detail before the complaint is filed and the parties have opportunity for discovery," plaintiffs may not "wait until the last minute to ascertain and refine the theories on which they intend to build their case." Evans v. McDonald's Corp., 936 F.2d at 1091.

## LAW REGARDING EQUAL–PROTECTION CLASS–OF–ONE CLAIMS

The Equal Protection Clause of the Fourteenth Amendment guarantees that "no states shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The Equal Protection Clause 'keeps governmental decision makers from treating differently persons who are in all relevant respects alike.'" Soskin v. Reinertson, 353 F.3d 1242, 1247 (10th Cir. 2004)(quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)). See Corder v. Lewis

Palmer Sch. Dist. No. 38, 566 F.3d 1219, 1233 (10th Cir. 2009)("Equal protection 'is essentially a direction that all persons similarly situated should be treated alike.'")(quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).

1.      **The Substantive Law of Class–of–One Claims.**

The Supreme Court has "recognized successful equal protection claims brought by a class of one, where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Willowbrook v. Olech, 528 U.S. 562, 564 (2000). Class-of-one cases have presented a challenge to the lower courts since the Supreme Court established the doctrine in Willowbrook v. Olech. See Jennings v. City of Stillwater, 383 F.3d at 1211. The lower courts have recognized the risk that, "unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors." Jennings v. City of Stillwater, 383 F.3d at 1211-12. The Tenth Circuit recognized in Jennings v. City of Stillwater that it is nearly always possible for persons aggrieved by a government action to produce evidence of being treated differently than others and that it is always possible to allege such differential treatment. See Jennings v. City of Stillwater, 383 F.3d at 1211-12.

Recognizing the potentially unlimited nature of the claim, the Courts of Appeals have "proceeded cautiously in applying this theory." Jicarilla Apache Nation v. Rio Arriba Cty., 440 F.3d 1202, 1209 (10th Cir. 2006)(McConnell, J.). The Tenth Circuit in Jicarilla Apache Nation v. Rio Arriba County cautioned that "[a]n approach that reads Olech too broadly could transform the federal courts into general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state

and local autonomy in our federal system." Jicarilla Apache Nation v. Rio Arriba Cty., 440 F.3d at 1209 (citing Jennings v. City of Stillwater)(internal quotation marks omitted). In keeping with these concerns, the Tenth Circuit requires that a plaintiff must first establish that others, "similarly situated in every material respect" were treated differently to prevail. Jicarilla Apache Nation v. Rio Arriba Cty., 440 F.3d at 1210. "A plaintiff must then show this difference in treatment was without rational basis, that is, the government action was 'irrational and abusive,' and 'wholly unrelated to any legitimate state activity.'" Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1216 (quoting Mimics, Inc. v. Vill. of Angel Fire, 394 F.3d 836, 849 (10th Cir. 2005)). Courts do not inquire into the government actor's actual motivations. Kansas Penn Gaming, LLC v. Collins, 656 F.3d at 1216.[10]

---

[10]There appears to have been some confusion regarding whether the Tenth Circuit requires a plaintiff to allege some degree of animus as well. Although earlier Tenth Circuit opinions suggested that a plaintiff must prove some degree of animus, see Mimics, Inc. v. Village of Angel Fire, 394 F.3d at 849 (stating that plaintiffs "must prove that they were singled out for persecution due to some animosity" (internal quotation marks omitted)), the Tenth Circuit subsequently treated the issue as an open question, see Jicarilla Apache Nation v. Rio Arriba Cty., 440 F.3d at 1209-10, and the quoted language from Kansas Penn Gaming, LLC v. Collins supports an objective standard -- not an inquiry into subjective culpability. As the Honorable John E. Dowdell, United States District Judge for the District of Oklahoma, stated when considering a motion to dismiss for failure to state a claim under rule 12(b)(6):

> [T]he Collins court omitted the animosity language found in Mimics and reiterated that the standard is an *objective* one. Given the Collins court's emphasis on the "objective" nature of the inquiry, and the logic thereof, the Court declines to impose a requirement that the plaintiffs make a showing of ill will or animosity . . . .

Sutherlin v. Indep. Sch. Dist. No. 40 of Nowata Cty., Okla. No. 12–CV–636–JED–PJC, 2013 WL 1975644, at *5 n. 3 (D. Okla. May 13, 2013)(Dowdell, J.)(emphasis in original). The Court acknowledges its past statement that "[t]o show a constitutional violation under the 'class of one' theory," the plaintiff must prove "that the Defendants acted with discriminatory intent" in Kelley v. City of Albuquerque, 375 F.Supp.2d 1183, 1205 (D.N.M. 2004)(Browning, J.). That statement preceded both Jicarilla Apache Nation v. Rio Arriba County and Kansas Penn Gaming, LLC v. Collins, and the Court agrees with Judge Dowdell's description of the Tenth Circuit's evolution in this regard. The Court will not, therefore, require a showing of animosity to sustain a class-of-one claim.

The Tenth Circuit has noted: "'The paradigmatic 'class of one' case, sensibly conceived, is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen.'" Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1216 (internal alteration omitted)(quoting Lauth v. McCollum, 424 F.3d 631, 633 (7th Cir. 2005)(Posner, J.)). "Successful claims have arisen from unfavorable zoning decisions, withholding of permits, and selective regulatory enforcement." Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1216 (internal citations omitted). The Supreme Court has also held that "the class-of-one theory of equal protection has no application in the public employment context." Engquist v. Or. Dep't of Agric., 553 U.S. 591, 607-08 (2008)(reasoning that "an allegation of arbitrary differential treatment could be made in nearly every instance" of a personnel decision by the government and that "government offices could not function if every employment decision became a constitutional matter"). See Kelley v. City of Albuquerque, 542 F.3d 802, 821 (10th Cir. 2008)("[T]he class-of-one theory is not legally cognizable where . . . a public employee claims that she has been treated differently than other employees."); Duprey v. Twelfth Judicial Dist. Court, No. CIV 08-0756 JB, 2009 WL 2105955, at *5 (D.N.M. June 22, 2009)(Browning, J.)("In this case, Duprey, who is a public employee, is alleging that she was denied a promotion and was demoted. Because her lawsuit arises in the public-employee context, she cannot proceed on the class-of-one theory.").

2.      **The Similarly Situated Individual Pleading Requirement for Class-of-One Claims or Claims Based on membership in a Non–Protected Class.**

"Equal protection jurisprudence has traditionally been concerned with governmental action that disproportionally burdens certain classes of citizens." Kan. Penn Gaming, LLC v. Collins, 656 F .3d at 1215-16. A plaintiff alleging disparate-treatment discrimination based on membership in a non-protected class or in a class of one must therefore allege in the complaint that similarly

situated persons were treated differently.  See Brown v. Montoya, 662 F.3d at 1173 ("The pleading requirement of an allegation that a similarly situated person was treated differently applies both when the plaintiff challenges a government action that discriminates based on membership in a non-protected class, or membership in a 'class of one.'")(internal citations omitted)(citing PriceCornelison v. Brooks, 524 F.3d 1103, 1120 (10th Cir. 2008)); Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1216).  As the Supreme Court set forth in Village of Willowbrook v. Olech, a plaintiff may bring a class-of-one equal-protection claim, alleging that the plaintiff "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  528 U.S. at 564 (citing Sioux City Bridge Co. v. Dakota Cty., 260 U.S. 441 (1923); Allegheny Pittsburgh Coal Co. v. Cty. Comm'n of Webster Cty., 488 U.S. 336 (1989)).  Similarly, discrimination against members of a non-protected class, such as White-Anglos, violates equal protection.  See McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 279-80 (1976)(holding that Title VII "proscribe[s] racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites."); Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C., 462 U.S. 669, 676 (1983)(extending this proposition to Equal Protection Clause violations); Reynolds v. Sch. Dist. No. 1, Denver, 69 F.3d 1523, 1532 & n. 10 (10th Cir. 1995)(recognizing that the Equal Protection Clause proscribes discrimination against White-Anglos).

The law of equal protection traditionally deals with "groups unified by the characteristic alleged to be the root of the discrimination."  Jennings v. City of Stillwater, 383 F.3d at 1213. Where a group is involved, the problem is simplified; in this traditional situation, "the sample size is large enough to raise a concern that the disfavored class was selected . . . because of their membership in the class."  Jennings v. City of Stillwater, 383 F.3d at 1213.  A unique feature of

the class-of-one claim is that it essentially exempts plaintiffs from proving membership in one of these groups; rather, they need prove only that he or she is "similarly situated" to other individuals or entities who have been treated more favorably. Addressing this unique characteristic of these claims, the Tenth Circuit in Jennings v. City of Stillwater noted that "[i]t is therefore imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the favored class." 383 F .3d at 1214.

Therefore, in these class-of-one claims, where discrimination is not alleged against a class of persons, "[t]he allegation that a plaintiff was treated differently from those similarly situated is an essential element of an equal protection action." Hennigh v. City of Shawnee, 155 F.3d 1249, 1257 (10th Cir. 1998)(holding that the plaintiff who alleged he "was subjected to discipline and a disciplinary proceeding *not applicable to any other police officer* under the Collective Bargaining Agreement," but not alleging any class-based discrimination, failed to state a claim, as the "Plaintiff did not show how he was treated differently from others similarly situated" (emphasis added))(citing Norton v. Vill. of Corrales, 103 F.3d 928, 933 (10th Cir. 1996)). In Norton v. Village of Corrales, for instance, where the Tenth Circuit concluded that "it is clear that they are not claiming unequal treatment on the basis of race, sex or other *classifications* which require heightened scrutiny," the Tenth Circuit dismissed the complaint, noting that the "Plaintiffs did not explicitly allege they were treated differently from similarly situated persons or corporations." 103 F.3d at 933 (emphasis added).

The Court has quoted this proposition of law -- "[t]he allegation that a plaintiff was treated differently from those similarly situated is an essential element of an equal protection action," Hennigh v. City of Shawnee, 155 F.3d 1249 -- in the § 1983 employment-discrimination context where the plaintiff alleged that the defendant discriminated against him based on his race. See

Gerald v. Locksley, 785 F. Supp. 2d at 1085, 1133.  The Court in that case had before it an equal

protection claim which was, at least in part, a class-of-one equal protection claim, and the cases

upon which the Court relied were limited to class-of-one equal-protection claims. See Gerald v.

Locksley, 785 F. Supp. 2d at 1133 ("Gerald's failure to allege that he was treated differently than

others similarly situated also defeats his Equal-Protection claim.")(citing Marino v. Mayger, 118

F. App'x 393, 299 (10th Cir. 2004)(unpublished)(upholding court's dismissal of the plaintiffs'

class-of-one claim for the plaintiffs' failure to "specifically allege that the sheriff treated them

differently from similarly situated landowners" by refusing to "enforce the restraining orders"

against the defendants); Jennings v. City of Stillwater, 383 F.3d at 1213 (upholding summary

judgment in favor of defendants on the plaintiff's class-of-one equal-protection claim, noting that

"she failed to make an adequate showing that similarly situated persons were treated differently")).

The Tenth Circuit has adhered to the proposition that, at the summary judgment stage, class

based disparate-treatment discrimination claims are subject to the same legal analysis whether

based on an equal-protection violation or Title VII violation.  See, e.g., Etsitty v. Utah Transit

Auth., 502 F.3d 1215, 1227 (10th Cir. 2007)("In disparate-treatment discrimination suits, the

elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or

Title VII.").  Showing disparate treatment of similarly situated individuals, while necessary for

class-of-one claims and claims where the plaintiff is not a protected-class member, and while

sufficient evidence of discrimination to meet the McDonnell Douglas Corp. v. Green, 411 U.S.

792 (1973), class-based prima facie case, is not necessary for class-based equal protection claims.

See Sorbo v. United Parcel Serv., 432 F.3d at 1173 (noting that the McDonnell Douglass Corp. v.

Green class-based prima facie case requirement that the adverse action be taken in circumstances

giving rise to an inference of discrimination "may be (and often is) satisfied by proof that the

employer treated similarly situated employees more favorably, such proof is just one sufficient means to do this and should not itself be mistaken as an indispensable element of the prima facie case"). See Hunt v. Cent. Consol. Sch. Dist., No. CIV 11–1144 JB/WDS, 2013 WL 3214928, at *32-34 (D.N.M. June 12, 2013)(Browning, J.)(discussing the McDonnell Douglas Corp v. Green framework's requirement that that "a prima facie case of discrimination must consist of evidence that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." (internal quotation marks omitted)). Accordingly, it is also not necessary for a plaintiff in a protected class pleading a class-based equal protection claim, to allege that similarly situated individuals were treated differently.

In Southwest Media Mobile, LLC v. City of Rio Rancho, No. CIV 13-0248 JB/KBM, 2013 WL 6920856 (D.N.M. Dec. 31, 2013)(Browning, J.), the Court granted summary judgment against a plaintiff alleging a class-of-one equal protection claim. See 2013 WL 6920856, at *28. The plaintiff, a mobile sign company, see 2013 WL 6920856, at *3, alleged an equal protection claim against Rio Rancho for passing a city ordinance restricting the use of signs, see 2013 WL 6920856, at *2. The Court concluded that the plaintiff could not show that similarly situated parties were treated differently, and that, just because "Southwest Media lacks competitors does not render Rio Rancho's attempt to regulate it produces a violation of the Equal Protection Clause." 2013 WL 6920856, at *29. The Court also found justifiable reasons for the ordinance, concluding that the city's "aesthetics and traffic safety" concerns demonstrated that the ordinance had a rational basis. 2013 WL 6920856, at *30-31.

## LAW REGARDING PROCEDURAL DUE PROCESS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty,

or property, without due process of law." U.S. Const. amend. XIV. The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons. See Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)). "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.). The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?" Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972). "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)). The Supreme Court has "made clear that the property interests protected by the procedural due process clause extend well beyond actual ownership of real estate, chattels, or money. By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." Bd. of Regents of State Colls. v. Roth, 408 U.S. at

571-72. "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries" for "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty" guaranteed, the Supreme Court has stated the following:

> Without a doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men. In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

<u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 572.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 576. These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms." <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. <u>Goldberg v. Kelly</u>, 397 U.S. 254 . . . [(1970)]. <u>See</u> <u>Flemming v. Nestor</u>, 363 U.S. 603, 611 . . . [(1960)]. Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, <u>Slochower v. Bd. of Education</u>, 350 U.S. 551 . . . [(1956)], and college professors and staff members dismissed during the terms of their contracts, <u>Wieman v. Updegraff</u>, 344 U.S. 183 . . . [(1952)], have interests in continued employment that are safeguarded by due process.

<u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 576-77.

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly

must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007). See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law."). "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. at 334. The Supreme Court has explained that

the root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.

This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.

. . . .

[T]he pretermination hearing, though necessary, need not be elaborate. We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545(footnote omitted).

The United States Court of Appeals for the Second Circuit has stated:

The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507, [529] . . . (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335, 96 S. Ct. 893). A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" Id. (quoting Mathews v. Eldridge, 424 U.S. at 335. . . .).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004). The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose. See Mathews v. Eldridge, 424 U.S. at 335. For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate." Clark v. City of Draper, 168 F.3d at 1189. See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").

The Court has previously considered procedural due process violations several times. For example, in See A.M. through Youngers v. N.M. Dep't of Health, 2015 WL 13668431, at *37-43 (D.N.M. Dec. 7, 2015)(Browning, J.), the Court concluded that the New Mexico Department of Health violated due process when it afforded a woman with developmental disabilities no process before depriving her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it afforded her no process for deprivation. See A.M. through Youngers v. New Mexico Department of Health, 2015 WL 13668431, at *37-43. The Court has also concluded that a tenured city employee was not denied due process when the city fired him, because the city afforded him a hearing. See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win."). See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d at 1215 (denying due process claims where a state employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers."); Camuglia v. City of Albuquerque, 375 F. Supp. 2d 1299, 1308-09 (D.N.M. 2005)(Browning, J.), aff'd, Camuglia v. City of Albuquerque, 448 F.3d at 1220-21 ("[I]t cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner.").

## RELEVANT IMMIGRATION LAW

The Attorney General of the United States is authorized to adjust the status of an alien to permanent resident under certain circumstances. See 8 U.S.C. § 1255(a). The Attorney General may not adjust statuses for "an alien . . . who has failed (other than through no fault of his own or for technical reasons) to maintain continuously a lawful status since entry into the United States."

8 U.S.C. § 1255(c)(2).  If the alien did not continuously maintain a lawful status, the Attorney General still may grant him or her lawful permanent residency if "the alien, subsequent to such lawful admission has not, for an aggregate period exceeding 180 days -- failed to maintain, continuously, a lawful status."  8 U.S.C. § 1255(k)(2)(A).  Congress added this language to the statute in 1986.  <u>See</u> Immigration Reform and Control Act of 1986, Pub. L. 99-603, 100 Stat. 3359.

The Immigration and Naturalization Service promulgated regulations interpreting these statutes the next year.  <u>See</u> Adjustment of Status to That of Persons Admitted for Permanent Residence; Creation of Records of Lawful Admission for Permanent Residence, 52 Fed. Reg. 6320-01 (March 3, 1987).  The current regulations state that "*other than through no fault of his or her own or for technical reasons* shall be limited to" four categories:

> (i) Inaction of another individual or organization designated by regulation to act on behalf of an individual and over whose actions the individual has no control, if the inaction is acknowledged by that individual or organization . . . ; or

> (ii) A technical violation resulting from inaction of the Service (as for example, where an applicant establishes that he or she properly filed a timely request to maintain status and the Service has not yet acted on that request).  An individual whose refugee or asylum status has expired through passage of time, but whose status has not been revoked, will be considered to have gone out of status for a technical reason.

> (iii) A technical violation caused by the physical inability of the applicant to request an extension of nonimmigrant stay from the Service either in person or by mail (as, for example, an individual who is hospitalized with an illness at the time nonimmigrant stay expires).  The explanation of such a technical violation shall be accompanied by a letter explaining the circumstances from the hospital or attending physician.

> (iv) A technical violation resulting from the Service's application of the maximum five/six year period of stay for certain H-1 nurses only if the applicant was subsequently reinstated to H-1 status in accordance with the terms of Public Law 101-656 (Immigration Amendments of 1988).

8 C.F.R. § 245.1(d)(2) (emphasis in original).  When the Immigration and Naturalization Service first promulgated its interim rule defining "other than through no fault of his or her own or for

technical reasons," it stated that it "was guided by Congressional intent as stated in the Report of the Committee on the Judiciary of the United States Senate on S. 1200, 'to make adjustment of status a much less frequently used method of obtaining permanent resident status in the United States.'" 52 Fed. Reg. at 6320. It further concluded that, under its interim rule:

> An applicant who fails to maintain status because he or she is awaiting a decision on a labor certification request from the Department of Labor or a visa petition from the Service before filing an application for adjustment has not failed to maintain "through no fault of his own for technical reasons" and is ineligible to adjust.

52 Fed. Reg. at 6320 (quoting 8 U.S.C. § 1255(c)(2)).

## ANALYSIS

The Court grants in part and denies in part the Defendants' Partial MTD. Although the Court has jurisdiction to review Immigration Services' denial of Father McGuire's Form I-485 Application, the Complaint states only a single claim for relief under the APA. Father McGuire's Equal Protection Clause claim, Due Process Clause claim, ineffective assistance claim, and equitable tolling claim are arguments why he is entitled relief under the APA and do not provide independent grounds for relief outside the APA. The Court also concludes that 8 C.F.R. § 245.1(d)(2)(i) is an impermissible interpretation under Chevron, and that the Court does not have jurisdiction under Article III of the Constitution to grant the relief which Father McGuire seeks because of Immigration Services' failure to process his application faster.

## I. THE COURT HAS JURISDICTION TO REVIEW IMMIGRATION SERVICES' DENIAL OF FATHER MCGUIRE'S FORM I-485 APPLICATION.

The Court notes from the outset that it has jurisdiction to review the denial of Father McGuire's Form I-485 application under 28 U.S.C. § 1331. The Defendants do not argue that the Court does not have jurisdiction to review the Form I-485 application denial, or the motion to reconsider and reopen denial, but, as a court of limited jurisdiction, the Court must determine whether it has

jurisdiction before proceeding on the merits.  See Lance v. Coffman, 549 U.S. 437, 439 (2007).

The APA precludes judicial review of agency decisions where other "statutes preclude judicial

review" or where "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a).

Here, 8 U.S.C. § 1252(a)(2)(B), the immigration jurisdiction-stripping statute, does not apply

because, although the denial was pursuant to 8 U.S.C. § 1255 -- which vests approval of a status

adjustment application in the Attorney General's discretion -- Tenth Circuit has held that

§ 1252(a)(2)(B) "prohibit[s] review only of those 'judgments' that are discretionary in nature."

Sabido Valdivia v. Gonzales, 423 F.3d 1144, 1149 (10th Cir. 2005)(quoting 8 U.S.C.

§ 1252(a)(2)(B)).  The decision denying Father McGuire's Form I-485 application for adjustment

of status does not indicate that it was discretionary and appears to be based on only statutory

ineligibility, so the Court may review the decision.  See Decision RE: I-485 Application to Register

Permanent Residence or Adjust Status at 1-4 (dated May 15, 2017), filed April 17, 2018 (Doc. 26-

1)("I-485 Decision").[11]  The Defendants do not contend that the denial was discretionary.  Further,

the denial is a final agency action, because there is no indication that Immigration Services has

initiated removal proceedings against Father McGuire.  See Borjas v. United States, No. 16-cv-

01026-CMA, 2018 WL 1084372, at *2 (D. Colo. Feb. 28, 2018)(Arguello, J.)(concluding that an

adjustment of status decision is a reviewable, final agency action where there are no ongoing

removal proceedings).

---

[11]In reviewing a motion to dismiss under rule 12(b)(6) of the Federal Rules of Civil
Procedure, a court may consider documents to which the complaint refers, if their adequacy is
central to the plaintiffs' claims and their authenticity is unquestioned.  See Armstrong v. N.M.
Disability Det. Servs., 278 F. Supp. 3d 1193, 1201 n.3 (D.N.M. 2017)(Browning, J.).  The
Complaint references the I-485 Decision, the adequacy of the I-485 Decision is central to
McGuire's claim for APA review, and the Defendants do not question the I-485 Decision's
authenticity.

## II. FATHER MCGUIRE HAS NOT STATED A CLAIM FOR RELIEF IN COUNT 1, BECAUSE THE COURT DOES NOT HAVE JURISDICTION TO REVIEW HIS I-360 APPLICATION, HE HAS NOT ALLEGED THAT HE WAS TREATED DIFFERENTLY THAN OTHER SIMILARLY SITUATED APPLICANTS, AND IMMIGRATION SERVICES' PROCEDURES DO NOT IMPLICATE THE DUE PROCESS CLAUSE.

Preliminarily, part of Father McGuire's "Request for Relief" asks that the Court "[a]ccept jurisdiction and review Defendants' 356-day process whereby it granted the Diocese's I-360." Complaint at 23. The Court, as a federal district court, is a court of limited jurisdiction and cannot accept jurisdiction where it has none. See Penteco Corp., Ltd. P'ship v. Union Gas Sys., Inc., 929 F.2d 1519, 1521 (10th Cir. 1991). Although the amount of time that Immigration Services took to approve the I-360 plausibly harmed Father McGuire, there is nothing that the Court can do regarding the Form I-360 application itself to redress this injury -- the Court cannot compel action that has already been taken, and holding the approval unlawful and setting it aside for being unlawful would not help Father McGuire. Further, the Court cannot issue a declaration that Immigration Services took an unreasonable amount of time in adjudicating Father McGuire's Form I-360 application, because this declaration would "serve no purpose in this case[,] . . . would not affect the matter, and would be in the nature of an advisory opinion." S. Utah Wilderness All. v. Smith, 110 F.3d 724, 730 (10th Cir. 1997). Accordingly, to the extent that the Complaint states a claim for APA review of the Form I-360 approval, the Court dismisses this claim for lack of Article III subject-matter jurisdiction.

### A. IMMIGRATION STATUS ADJUSTMENT IS NOT AN INTEREST THAT THE DUE PROCESS CLAUSE PROTECTS.

Immigration Services denied Father McGuire's I-485 application to adjust his immigration status, because his visa had expired for longer than six months when he filed the application. See Complaint ¶ 1, at 2. Father McGuire is currently not a lawful United States permanent resident,

- 54 -

as he hoped, and remains in the United States without lawful immigration status. As it denied his I-485 Application, Immigration Services informed Father McGuire that it may begin removal proceedings against him at any time and that his status "may affect [his] ability to return to the United States in the future." I-485 Decision at 3. He contends that Immigration Services has violated his rights under the Due Process Clause, because of its delay in processing his I-360 visa petition. See Complaint ¶ 54, at 18 ("Defendants cannot, consistent with due process, breach their duty to timely adjudicate the I-360 for Father McGuire and then deny Father McGuire's I-485 application and his motion to reopen because of their own failure.").

The Due Process Clause of the Fifth Amendment states that no person shall "be deprived of life, liberty, or property, without due process of law" by the federal government. U.S. Const. amend. V. The Due Process Clause protects a limited range of deprivations. See Meachum v. Fano, 427 U.S. 215, 224 (1976)("We reject at the outset the notion that *any* grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause." (emphasis in original)). The threshold question is not whether the party has suffered a serious loss at the government's hands, but whether the government has deprived the party of life, liberty, or property. See Bd. of Regents of State Colls. v. Roth, 408 U.S. at 570-71 ("But, to determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the *nature* of the interests at stake.").

The Due Process Clause protects some entitlements and government benefits. See Goldberg v. Kelly, 397 U.S. at 262 (concluding that recipients hold a property interest in welfare benefits). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408

U.S. at 577.  The Supreme Court has noted that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."  Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 756 (2005)(citing Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 462-63 (1989)).  In the Tenth Circuit, a "'property interest exists if discretion is limited by the procedures in question, that is, whether the procedures, if followed, *require a particular outcome.*  However, where the governing body retains discretion and the outcome of the proceeding is not determined by the particular procedure at issue,' then no property interest exists."  Martin Marietta Materials, Inc. v. Kan. Dep't of Transp., 810 F.3d 1161, 1178 (10th Cir. 2016)(quoting Crown Point I, LLC v. Intermountain Rural Elec. Ass'n, 319 F.3d 1211, 1217 (10th Cir. 2003)(emphasis in Martin Marietta Materials, Inc. v  Kan. Dep't of Transp. but not in Crown Point I, LLC v. Intermountain Rural Elec. Ass'n).  See Ky. Dep't of Corr. v. Thompson, 490 U.S. at 462-63.  "'[I]n immigration proceedings, a petitioner has no liberty or property interest in obtaining purely discretionary relief.'"  Arambula-Medina v. Holder, 572 F.3d 824, 828 (10th Cir. 2009)(quoting Dave v. Ashcroft, 363 F.3d 649, 652-53 (7th Cir. 2004)).

A status adjustment to lawful permanent resident is not a protected entitlement, because the decision to adjust is left to the Attorney General's discretion.  Under 8 U.S.C. § 1255(a), an alien's status "may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe."  The regulations that the Immigration Services has promulgated reserve discretion with the Attorney General and do not suggest that if an alien meets all eligibility requirements their status will be adjusted.  See Martin Marietta Materials, Inc. v. Kan. Dep't of Transp., 810 F.3d at 1178.  See generally 8 C.F.R. § 245.1.  While the regulations narrow the range of aliens who may apply for an adjustment, they do not "provide decisionmaking criteria which serve to limit discretion."  Ky. Dep't of Corr. v. Thompson, 490 U.S. at 462 (citing Bd. of Pardons

v. Allen, 482 U.S. 369, 381 (1987)(holding that a state statute making parole mandatory upon certain findings by a parole board established a property interest); Hewitt v. Helms, 459 U.S. 460, 472 (1983)(concluding that, when the state created a liberty interest vis-à-vis administrative segregation in prisons, it went beyond "simple procedural guidelines" and used "language of an unmistakably mandatory character"); Aguilera v. Kirkpatrick, 241 F.3d 1286, 1293 (10th Cir. 2001)("In order for the regulation to create a liberty interest, it must substantively limit the exercise of official discretion through specifically defined criteria that guide official decision making."). Accordingly, the Due Process Clause does not protect adjustment of immigration status. See Nativi-Gomez v. Ashcroft, 344 F.3d 805, 809 (8th Cir. 2003)("The failure to receive discretionary adjustment-of-status relief does not constitute the deprivation of a constitutionally-protected liberty interest"); Azizi v. Thornburgh, 908 F.2d 1130,1134 (2d Cir. 1990)("The Azizis cannot succeed on their due process challenge, because they do not have an inherent property right in an immigrant visa.").

### B. FATHER MCGUIRE HAS NOT STATED ADEQUATELY AN EQUAL PROTECTION CLAIM.

The Defendants argue that the Court should dismiss Father McGuire's Equal Protection Clause claim, because "he fails to make the necessary allegation that he was treated differently from similarly situated persons." Partial MTD at 12 (citing Brown v. Montoya, 662 F.3d at 1173). Father McGuire asserts, in response, that he has stated a "class-of-one" claim, Response at 31 (citing Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1216), and that "the test, therefore, is whether Defendants had a rational basis for processing his I-360 differently," Response at 31. He also argues that his processing time was much longer than two other priests for which the Gallup Diocese submitted I-360s. See Response at 32-33.

Parties may bring claims under the Equal Protection Clause even though they do not allege

membership in a group or class. See Village of Wilowbrook v. Olech, 528 U.S. at 564 (concluding that, to prevail on a "class-of-one" claim, a "plaintiff must show he or she (as opposed to a class in which he is a member) was 'intentionally treated differently from others similarly situated.'");

SECSYS, LLC v. Vigil, 666 F.3d 678, 689 (10th Cir. 2012)(quoting Village of Willowbrook v. Olech, 528 U.S. at 564). Second, the plaintiff must show that there was no rational basis for the different treatment. See SECSYS, LLC v. Vigil, 666 F.3d at 688. In the years after the Supreme Court's decision in Village of Wilowbrook v. Olech, the Tenth Circuit expressed strong reservations about entertaining class-of-one challenges:

> [T]he concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors. It is always possible for persons aggrieved by government action to allege, and almost always possible to produce evidence, that they were treated differently from others, with regard to everything from zoning to licensing to speeding to tax evaluation. It would become the task of federal courts and juries, then, to inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection review. This would constitute the federal courts as general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system.

Jennings v. City of Stillwater, 383 F.3d at 1210-11. See Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1216-17 ("The latitude afforded police officers, IRS agents, university administrators, zoning officials, and other, similar government actors necessarily results in a sizeable amount of random variation in outcome. If even innocuous inconsistencies gave rise to equal protection litigation, government action would be paralyzed."). "It is therefore imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the favored class." Jennings v. City of Stillwater, 383 F.3d at 1214.

The Supreme Court refined its "class of one" Equal Protection doctrine in Engquist v. Oregon Department of Agriculture, 553 U.S. 591. In rejecting the petitioner's argument that she

could assert "class of one" claim against the Oregon Department of Agriculture for arbitrarily firing her, the Supreme Court reiterated its "traditional view of the core concern of the Equal Protection Clause as a shield against arbitrary classifications." 553 U.S. at 598. It stated that it had "long held the view that there is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation.'" Engquist v. Or. Dep't of Agric., 553 U.S. at 598 (quoting Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 896 at (1961)). The Supreme Court also observed that the cases Village of Willowbrook v. Olech relied on in recognizing class-of-one Equal Protection claims "concerned property assessment and taxation schemes." 553 U.S. at 602 (citing Allegheny Pittsburgh Coal Co. v. Comm'n of Webster Cty, 488 U.S. 336; Sioux City Bridge Co. v. Dakota Cty., 260 U.S. 441). In these circumstances, it is reasonable to "expect such legislative or regulatory classifications to apply 'without respect to persons.'" Engquist v. Or. Dep't of Agric., 553 U.S. at 602 (quoting 28 U.S.C. § 453). The necessary factor making these equal protection claims viable is "the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed." 553 U.S. at 602.

The Supreme Court contrasted these cases with cases characterized by state actions that "by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." 553 U.S. at 603. Here, "allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." 553 U.S. at 603. As an example, the Supreme Court discussed a traffic officer faced with innumerable motorists driving above the speed limit and concluded that

> allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reasons, would be incompatible with the discretion inherent in the challenged action. It is no proper

challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized.

553 U.S. at 604.  While its logic applied broadly, later in the opinion, the Supreme Court explicitly noted that it was deciding only that the "class-of-one theory of equal protection has no application in the public employment context."  553 U.S. at 607.

In this case, Father McGuire has alleged a "class of one" Equal Protection Claim for discrimination based on state action.  Response at 31.  While the Supreme Court has not extended Engquist v. Oregon Department of Agriculture's logic beyond the government employment context, its reasoning neatly applies to this case's facts.  The Supreme Court previously has found a valid equal protection claim where a county tax assessor, "apparently on her own initiative, applied state tax law in a manner resulting in significant and persistent disparity in assessed value," Allegheny Pittsburgh Coal Co. v. Cty. Comm'n of Webster Cty., 488 U.S. at 337, and where a town "intentionally demanded a 33-foot easement . . . where the Village required only a 15-foot easement from other similarly situated property owners."  Vill. of Willowbrook v. Olech, 528 U.S. at 565.  Comparable standards are required for plaintiffs to demonstrate that the government "'intentionally treated [them] differently from others similarly situated.'"  SECSYS, LLC v. Vigil, 666 F.3d at 689 (quoting Vill. of Willowbrook v. Olech, 528 U.S. at 564).

Father McGuire alleges that when he submitted his I-360, Immigration Services' California Service Center processed I-360 petitions in an average of 174 days.  See Complaint ¶ 33, at 11.  He also states that Immigration Services currently processes ninety-three percent of applications within seventh months and that its goal is to decide on each application within six months.  See Complaint ¶ 33, at 11-12.  He asserts that the 356 days it took Immigration Services to approve his application was "discrimination" that "occurred without a rational basis."  Complaint ¶ 55, at 19.

Taking these facts as true, nothing in Father McGuire's Complaint suggests that Congress has supplied "clear standard against which departures, even for a single plaintiff, [can] be readily assessed." Engquist v. Or. Dep't of Agric., 553 U.S. at 602. Father McGuire notes that 5 U.S.C. § 555(b) obliges agencies "to conclude a matter presented to it" "within a reasonable time" and argues that Immigration Services therefore had a "nondiscretionary duty" to process his application within 180 days. Response at 20 (citing 8 U.S.C. § 1255(k)(2) (providing a 180-day grace period for applicants who did not maintain lawful immigration status)). These statutes impose a duty to process applications "within a reasonable time," e.g., Zhu v. Chertoff, 525 F. Supp. 2d 1098, 1100 (W.D. Mo. 2007)(Laughrey, J.)("Zhu has a clear, indisputable and nondiscretionary right to have the USCIS adjudicate his application within a reasonable time."), and the § 1255(k)(2) grace period is a factor in determining what is reasonable. The statutes do not impose, however, a 180-day processing requirement. "Reasonable time" will vary for each I-360 applicant depending on a number of factors. Some factors, such as the current volume of I-360 applications, will have nothing to do with the applicant. Elsewhere in the Immigration and Nationality Act, Congress has suggested that 180 days is a goal for agencies processing immigration benefits, but not a firm statutory requirement. See 8 U.S.C. § 1571(b). Finally, even if Immigration Services had a clear duty to process I-360 applications within six months, Immigration Services does not violate the Equal Protection Clause every time it fails to meet this standard, so long as it is not consistently discriminating against certain classifiable groups or individuals. The Complaint suggests that this discrimination did not occur. When Father McGuire applied in 2016, roughly half of all I-360 applications took longer than six months at the California Service Center. See Complaint ¶ 32, at 11.

Father McGuire cites two similarly situated priests I-360 processing experiences, but these examples do not help him state a claim. Even if an identically situated applicant had submitted an I-360 form on the same day as Father McGuire, drastically different processing times for the two applications would still not be arbitrary and capricious. Where "discretion is high and variation is common," as it is in I-360 processing, Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1218; see Complaint ¶ 33, at 11 (stating that fifty percent of applications are processed in less than four months, forty-three percent are processed after four to seven months, and seven percent take more than seven months), the Tenth Circuit has cautioned courts against recognizing class-of-one claims, see Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1218. The Court, therefore, dismisses Father McGuire's class-of-one Equal Protection Clause claim.

### III. FATHER MCGUIRE'S CLAIM FOR "INEFFECTIVE ASSISTANCE BY ANOTHER" DOES NOT STATE AN INDEPENDENT CLAIM, BUT THE REGULATION ON WHICH FATHER MCGUIRE BASES HIS CLAIM IS AN IMPERMISSIBLY NARROW INTERPRETATION OF 8 U.S.C. § 1255(C)(2).

The Court concludes that 8 C.F.R. § 245.1(d)(2)(i) is an impermissibly narrow interpretation of 8 U.S.C. § 1255(c)(2). Under the Chevron framework, the Court first analyzes "whether Congress has directly spoken to the precise issue" in the statute. Maralex Resources, Inc. v. Barnhardt, 913 F.3d at 1198. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43. If congressional intent is not clear after employing all the ordinary tools of statutory interpretation, courts move to Chevron's second step and analyze whether the agency's chosen interpretation is reasonable. See Big Horn Coal Co. v. Sadler, 924 F.3d 1317, 1323 (10th Cir. 2019).

Section 245.1(d)(2)(i) satisfies Chevron's first step. "To determine whether Congress has spoken directly to an issue, we look at both the statute's language and the legislative history." Big

Horn Coal Co. v. Sadler, 924 F.3d at 1323.  See N.M. v. Dep't of Interior, 854 F.3d 1207, 1227 (10th Cir. 2017)("In addressing DOI's argument, we assume *arguendo* that an inquiry into legislative history is generally appropriate at Chevron step one").  The language states that the Attorney General may not adjust statuses for "an alien . . . who has failed (other than through no fault of his own or for technical reasons) to maintain continuously a lawful status since entry into the United States."  8 U.S.C. § 1255(c)(2).  The statute leaves open-ended and vague what "no fault of his own" means, and Congress nowhere else clarifies the phrase.  8 U.S.C. § 1255(c)(2).  This indeterminacy is sufficient to implicate Chevron.  See Chevron, 467 U.S. at 840 (analyzing whether the EPA's "bubble" concept is a reasonable construction of the term "stationary source"); Neal A. Hoopes, Note, Chevron's Pure Questions: Searching for Meaning in Ambiguity, 2017 B.Y.U. L. Rev. 663, 693-96 (2017)(arguing that vagueness, rather than ambiguity, triggers Chevron).  The Immigration and Nationality Act includes similar language elsewhere in the statute, but the separate usages do not suggest a concrete definition.  See 8 U.S.C. § 1186a(c)(4)(B)-(C) ("[T]he qualifying marriage was entered into in good faith by the alien spouse . . . and the alien was not at fault in failing to meet the requirements of paragraph (1)"); 8 U.S.C. § 1229a(b)(5)(C)(ii) (providing for rescission of a removal order "upon a motion to reopen filed at any time if the alien demonstrates that the alien did not receive notice . . . or the alien demonstrates that the alien was in Federal or State custody and the failure to appear was through no fault of the alien").

The statute's legislative history does not provide clarity on the statute's proper scope.  As support for its definition in 8 C.F.R. § 245.1, the Immigration and Naturalization Service stated that it "was guided by Congressional intent as stated in the Report of the Committee on the Judiciary of the United States Senate on S. 1200, 'to make adjustment of status a much less

frequently used method of obtaining permanent resident status in the United States.'" 52 Fed. Reg. at 6320 (quoting S. Rep. 99-132, at 31 (1985)). Congress accomplished this limiting intent, however, with its amendment to § 1255(c)(2)'s text. After the 1986 amendment, aliens who did not have a lawful immigration status when they filed for an adjustment and aliens who did not have continuous legal status for any reason since their immigration to the United States could no longer petition the Attorney General for adjustment -- excepting, of course, those aliens whose failure to meet these criteria was from no fault of their own or due to technical reasons. See Immigration Reform and Control Act of 1986, Pub. L. 99-603, 100 Stat. 3359. Before this amendment, the only aliens who could not apply for a status adjustment were those who had failed to maintain lawful status due to unauthorized employment.

Having concluded that Congress has not spoken clearly to the issue, the Court moves to Chevron's second step and asks whether the agency has chosen a reasonable interpretation of the statute. See Big Horn Coal Co. v. Sadler, 924 F.3d at 1323. Immigration Services has defined "through no fault of his own" to mean solely the "[i]naction of another individual or organization designated by regulation to act on behalf of an individual and over whose actions the individual has no control, if the inaction is acknowledged by that individual or organization." 8 C.F.R. § 245.1(d)(2)(i). Immigration Services' definition is not reasonable; it limits, without a textual basis, the statute's seemingly broad exception to limited circumstances, and it undermines the Immigration and Nationality Act's statutory scheme.

Title 8 section 1255 permits the Attorney General to adjust an alien's status "in his discretion and under such regulations as he may prescribe." 8 U.S.C. § 1255(a). While the agency thus has the power to promulgate limiting regulations, "[n]othing in the statute allows for the regulatory interpretation that only certain individuals who fall into unlawful status through no fault

of their own or for technical reasons may qualify for this exception." <u>Alimoradi v. U.S. Citizenship</u> <u>& Immigration Servs.</u>, No. CV 08-02529 DDP (JCx), 2008 WL 11336668, at *4 (C.D. Cal. Aug. 29, 2008)(Pregerson, J.)(emphasis in original). The agency's 1987 justification for its rule -- the Senate Judiciary Report that accompanied the bill -- is weak support for the regulation. The Senate Report suggests that Immigration Services was not expected to implement the statute as strictly as its regulations suggest. In its "Purpose and Summary" section, the Senate Report states that "the bill . . . prohibits adjustments of status by visa abusers." S. Rep. 99-132, at 1. If Congress' intention was solely to target visa abusers, the agency's regulation is over-inclusive. Not every applicant who fails to satisfy 8 C.F.R. § 245.1(d)(1)(i)'s three-prong test for "no fault of his or her own" has abused the country's immigration system. For example, the regulation defines "no fault" as "inaction." 8 C.F.R. § 245(d)(1)(i). An alien's adjustment application that the alien's agent mistakenly botches is, thus, treated differently than an alien whose agent never submits his application. Likewise, the regulation treats aliens differently depending whether the individual or organization acting on the alien's behalf acknowledges its own inaction. Where the alien already "has no control" over the third-party that acted on his or her behalf, 8 C.F.R. § 245.1(d)(2)(i), it is still the alien's fault if the third-party never acknowledges, for any reason, its own inaction.

Expertise-based justifications for <u>Chevron</u> deference are not implicated here. <u>See</u> <u>Chevron</u>, 467 U.S. at 865 ("Perhaps [Congress] consciously desired the Administrator to strike the balance at this level, thinking that those with great expertise and charged with responsibility for administering the provision would be in a better position to do so."). While Immigration Services might have a better sense than Congress what "technical reasons" could commonly prevent an applicant from continuously maintaining lawful status, 8 U.S.C. § 1255(c)(2), it does not have any

special expertise in making judgments regarding applicants' personal blame for failing to follow its regulations.

The Court is not alone in finding fault with Immigration Services' regulations. Every court that has reviewed the Immigration Services' regulations in similar contexts has found them wanting. In Wong v. Napolitano, 2010 WL 916274, the Honorable Janice Stewart, United States Magistrate Judge for the United States District Court for the District of Oregon, concluded that, while Congress does not define "no fault of his or her own," the agency's construction of that phrase "improperly narrows the category of what may be considered no fault or a technical violation by excluding other potential bases." 2010 WL 916274, at *14. Magistrate Judge Stewart concluded that, because "immigration law is nearly impenetrable for a lay person and at times is uncertain, a reasonable and good faith reliance on the advice of counsel is a permissible basis for concluding an alien was not at fault." 2010 WL 916274, at *14. She further stated that, while Immigration Services could have provided "a list of factors for the agency to consider in determining whether a no fault or technical violation exists," "limiting the no fault and technical violation exception to only four circumstances does not maintain fidelity with Congressional intent as manifested in the statute and is not a reasonable construction." 2010 WL 916274, at *15. In Evangelista v. Johnson, No. CIV 14-13195-JCB, 2015 WL 12683978 (D. Mass. Oct. 30, 2015)(Boal, M.J.), the court concluded that Immigration Services' regulation is "impermissibly narrow," and, "[t]o the extent that the USCIS failed to consider the actions of Evangelista's former attorney in its decision, its decision is contrary to law." 2015 WL 12683978, at *5. The Honorable Robert Jones, United States District Judge for the District of Oregon, reached a similar conclusion in Mart v. Beebe, No. CIV 99-1391-JO, 2001 WL 13624 (D. Or. Jan. 5, 2001)(Jones, J.), where he concluded that 8 C.F.R. § 245.1(d)(2) "impermissibly limits the applicability of the words 'or

for technical reasons' in § 245(c)(2)," because the "Defendant's rule subverts that subsection's plain meaning: that any alien who falls into unlawful status 'through no fault of his own or for technical reasons' is not precluded from adjusting status under § 245(a)." 2001 WL 13624, at *5 (quoting 8 U.S.C. § 1255(c)(2)).

The Honorable Dean Pregerson, United States District Judge for the United States District Court for the Central District of California, has twice ruled for plaintiffs challenging Immigration Services' determination that they did not maintain lawful immigration status under 8 U.S.C. § 1255(c)(2). See Niu v. United States, 821 F. Supp. 2d 1164 (C.D. Cal. 2011)(Pregerson, J.); Alimoradi v. USCIS, 2009 WL 8633619, at *5-6 (C.D. Cal. Feb. 10, 2009)(Pregerson, J.). In Niu v. United States, the plaintiff filed an initial I-140 petition in July, 2007, but Immigration Services denied it in March, 2009. See 821 F. Supp. 2d at 1167. The plaintiff then refiled an I-140 petition before his visa expired on June 1, 2009, and then later filed a "materially identical" I-140 petition in December, 2009. 821 F. Supp. 2d at 1167. Immigration Services granted the second petition, but soon after it denied the first petition. See 821 F. Supp. 2d at 1167. In July, 2010, Immigration Services denied the plaintiff's I-485 application, because it had denied his first I-140 application, and because his visa had expired for over six months by the time he had filed the I-140. See 821 F. Supp. 2d at 1167. Without referencing the statute's regulations, Judge Pregerson concluded that Immigration Services "likely abused its discretion by denying Dr. Niu's final I-485 application." 821 F. Supp. 2d at 1169. See also Sayin v. United States, Cause No. 1:18-CV-643-LY, 2018 WL 4624827 (W.D. Tex. Sept. 26, 2018)(Yeakel, J.)(concluding, without discussing the regulations, that the plaintiffs satisfied 8 U.S.C. § 1255(c)(2)'s exception). He noted that Niu had "diligently pursued his immigration options and would have maintained lawful status throughout, but for the three years of delay by USCIS." 821 F. Supp. 2d at 1169.

Two years earlier, in <u>Alimoradi v. U.S. Citizenship and Immigration Services</u>, Judge Pregerson concluded that the plaintiff's failure to file a separate application for employment authorization constituted a "technical violation," under the statute. 2009 WL 8633619, at *5. In circumstances analogous to those before the Court, the plaintiff in <u>Alimoradi v. U.S. Citizenship and Immigration Services</u> sought to invoke the statute's "through no fault of his or her own" exception after relying on the mistaken advice of a third-party who, though an attorney, was largely unfamiliar with immigration law and "did not make an official appearance" in the case. 8 U.S.C. § 1255(c)(2). <u>See</u> 2009 WL 8633619, at *5. Judge Pregerson rejected the defendant's argument that the plaintiff deserved blame for relying on this unofficial advice, concluding that "no reasonable juror could find that Dr. Alimoradi was at fault," because "[i]t is hard to imagine a circumstance where a person has less control over their employment authorization than when, as with Dr. Alimoradi, his employer's general counsel mistakenly informs him that his employment authorization requirements have been satisfied." 2009 WL 8633619, at *5. <u>See Alimoradi v. U.S. Citizenship and Immigration Services</u>, 2008 WL 11336668 (holding that the regulation is arbitrary and capricious "because it fails to provide an exception for individuals who are crucial to our national interest and security, and it therefore presents a serious public safety risk.").

These cases present a strong argument against Immigration Services' regulation, but the Court looks to other areas of the law to determine whether Immigration Services' interpretation of "no fault of his own" is reasonable. Several federal rules of procedure excuse parties from deadlines for good cause. <u>See</u> Fed. R. Civ. P. 6(b)(1)(B) (permitting courts to extend deadlines for "good cause" if "the party failed to act because of excusable neglect"); Fed. R. App. P. 4(a)(5); Fed. R. Bankr. P. 9006(b)(1). In <u>Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership</u>, 507 U.S. 380 (1993), the Supreme Court interpreted the boundaries of rule 9006(b)(1)

of the Federal Rules of Bankruptcy Procedure. The case illustrates two important principles. First, while some federal procedure rules include a number of reasons to excuse a party's failure to meet deadlines, and while courts frequently confuse and combine these reasons, see, e.g., 21A Fed. Proc., L. Ed. § 51:131, Mistake, inadvertence, surprise, or excusable neglect as grounds for Rule 60(b) relief, generally ("'Mistake' and 'inadvertence' appear to be indistinguishable, and 'excusable neglect' is often linked with these two"), these rules are not unfettered grants to do justice without reference to their text. Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure permits late filings if the movant's failure to timely file is due to "excusable neglect." Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. at 383. The Supreme Court took these words one-at-a-time and analyzed the definition of "neglect" first. It rejected the petitioner's argument that, where a party is at fault, he or she cannot show "neglect." 507 U.S. at 388. Instead, the Supreme Court noted that this word encompasses two separate scenarios; "neglect" in this context means "both simple, faultless omissions to act and, more commonly, omissions caused by carelessness." 507 U.S. at 388. See id. at 394.

The Tenth Circuit has also noted that excusable neglect is sometimes distinct from situations where a party is at fault. In interpreting rule 4(a)(5)(A)(ii) of the Federal Rules of Appellate Procedure, which permits a court to extend the time to file a notice of appeal for "excusable neglect or good cause," Fed. R. App. P. 4(a)(5)(A)(ii), the Tenth Circuit has stated that "[g]ood cause comes into play 'in situations in which there is no fault -- excusable or otherwise. In such circumstances, the need for an extension is usually occasioned by something that is not within the control of the movant,'" Bishop v. Corsentino, 371 F.3d 1203, 1207 (10th Cir. 2004)(quoting Fed. R. App. P. 4(a)(5) advisory committee notes). Here, Congress could have written that Immigration Services should excuse failure to maintain lawful immigration status for

excusable neglect. By tying eligibility to an alien's fault in 8 U.S.C. § 1255(c)(2), Congress was clear that an alien's negligence is not an excuse. His or her failure to maintain status has to be beyond his or her control.

The Supreme Court also made clear in <u>Pioneer Investment Services Co. v. Brunswick Associates LP</u> that parties are not generally excused from the compliance with deadlines as a result of their attorney's mistakes. <u>See</u> 507 U.S. at 396-97. In the opinion's second section, the Supreme Court addressed when neglect is "excusable," and it concluded that, "[b]ecause Congress has provided no other guideposts for determining what sorts of neglect will be considered 'excusable,' we conclude that the determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." 507 U.S. at 395. While these factors include prejudice to debtor, length and reason for the delay, and the movant's good faith, the Supreme Court emphasized that the Sixth Circuit erred in suggesting that "it would be inappropriate to penalize respondents for the omissions of their attorney." 507 U.S. at 396. The Supreme Court concluded that "the proper focus is upon whether the neglect of respondents *and their counsel* was excusable." 507 U.S. at 397 (emphasis in original). The correct analysis, therefore, asks whether a party's attorney, acting as an agent, "did all he reasonably could to comply with the court-ordered bar date," and not whether a party reasonably policed his or her attorney's conduct. 507 U.S. at 396.

This standard is widely followed. <u>See</u>, <u>e.g.</u>, <u>Nelson v. Boeing Co.</u>, 446 F.3d 1118, 1121 (10th Cir. 2006)("[P]arties are responsible for the acts of their attorneys"); <u>Ceridian Corp. v. SCSC Corp.</u>, 212 F.3d 398, 404 (8th Cir. 2000)("While a court 'may properly find excusable neglect [where the language of a rule is ambiguous or susceptible to multiple interpretations or where an apparent conflict exists between two rules], . . . [the] failure to follow the clear dictates of a court

rule will generally not constitute excusable neglect.'" (quoting <u>Canfield v. Van Atta Buick/GMC</u> <u>Truck, Inc.</u>, 127 F.3d 248, 250 (2d Cir. 1997)(alterations in <u>Ceridian Corp. v. SCSC Corp.</u>))); <u>Edward H. Bohlin Co., Inc. v. Banning Co., Inc.</u>, 6 F.3d 350, 357 (5th Cir. 1993)("Texas Bohlin's ignorance of local rules or misconstruction of their applicability does not merit relief.").  As the Court has previously written,

> There is a tension between how the law treats attorney actions that are without authority, thus permitting relief under rule 60(b), and how the law treats those attorney actions which are inexcusable litigation decisions, thus failing to qualify for relief; although the distinction between those actions may not always be logical, it is well established.

<u>Payne v. Tri-State Careflight, LLC</u>, 322 F.R.D. 647, 670 (D.N.M. 2017)(Browning, J.)(quoting <u>Wilson v. Jara</u>, No. CIV 10-0797 JB/WPL, 2012 WL 1684595, at *7 (D.N.M. May 10, 2012)(Browning, J.)).  A corollary is that courts will not excuse non-compliance with an unambiguous statute even in the face of contrary legal advice.  <u>See</u> <u>United States v. Boyle</u>, 469 U.S. 241, 252, (1985)("It requires no special training or effort to ascertain a deadline and make sure that it is met. The failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent."); 47 Am. Jur. 2d Judgments § 659.  While criminal defendants are entitled to greater protection, immigration proceedings are civil in nature, and thus harmed plaintiffs cannot rely on the Sixth Amendment to the United States Constitution's protections against ineffective assistance of counsel.  <u>See</u> <u>INS v. Lopez-Mendoza</u>, 468 U.S. 1032, 1038 (1984).

These principles suggest that Immigration Services' interpretation of 8 U.S.C. § 1255(c)(2) is reasonable in all but the most extraordinary circumstances.  There are three elements to Immigration Services' "no fault of his own" definition: (i) "inaction"; (ii) "of another individual or organization designated by regulation to act on behalf of an individual over whose actions the individual has no control"; and (iii) "if the inaction is acknowledged by that individual or

organization." 8 C.F.R. § 245.1(d)(2)(i).  The second element -- that an individual or organization designated to act for an alien over whom he or she has no control must cause the error -- is a reasonable attempt to account for the traditional rule that parties are generally held accountable for the attorney's failures.  See Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962).  As parties are already responsible for the errors of their attorneys, this condition clarifies that the alien is still at "fault," 8 U.S.C. § 1255(c)(2), if he "voluntarily chose [his or her] attorney as his representative in the action," Link v. Wabash R.R. Co., 370 U.S. at 633.  See Amador v. Meeker, 2011 WL 4502092, at *2 n.3 (M.D. Fla. Sept. 11, 2011)(Whittemore, J.)(concluding that plaintiffs' reliance on the advice of a non-attorney in interpreting 8 C.F.R. § 245.1 was unreasonable, because they "knew she was not an attorney, and it is undisputed that she was not an authorized representative in the immigration process").  It also serves to clarify that the alien's own negligence, no matter the circumstances, cannot excuse him or her from being at "fault."  8 U.S.C. § 1255(c)(2).

Although Immigration Services' definition is reasonable absent extraordinary circumstances, such circumstances can occur, and the regulation's rigid definition does not adequately account for them.  Where, for example, an agent willfully fails to help the alien apply for a status adjustment, or where "an act of God" or similar event brought on by "forces beyond [a party's control]" prevents compliance, see Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P., 507 U.S. at 387, an alien has likely failed to maintain lawful status "through no fault of his own," 8 U.S.C. § 1255(c)(2).  Although 8 C.F.R § 245.1(d)(2)(i) may serve Immigration Services as helpful guidance, the agency must also have the flexibility to account for factual scenarios that neither it nor the Court can currently contemplate.  Still, no act of God or other forces beyond control appear to have prevented Father McGuire from complying with Immigration Services' deadline.  Instead, Father McGuire's predicament seems to be the result of his legal representative's negligence.  This

is traditionally not a reason to excuse compliance with legal deadlines.  See Pioneer Investment Services Co. v. Brunswick Associates LP, 507 U.S. at 396.

## IV.    IMMIGRATION SERVICES IS NOT REQUIRED TO EQUITABLY TOLL ITS DEADLINES FOR FATHER MCGUIRE.

The Complaint asserts that "[e]quitable tolling applies to Father McGuire's I-485 adjustment of status application" and that "[d]efendants wrongfully erred in not applying equitable tolling."  Complaint ¶ 71, at 23.  Father McGuire asserts that his case "meets every requirement" for the definition of "equitable estoppel" in Black's Law Dictionary.  Response at 24.  The Defendants argue that there is no such claim for equitable tolling, see Partial MTD at 17, and that administrative agencies are not courts of equity capable of employing this doctrine, see Partial MTD at 18.

Immigration Services is not required to consider equitable tolling as it reviews I-485 adjustments.  Equitable tolling "permits courts to extend statutes of limitations on a case-by-case basis in order to prevent inequity."  Stransky v. HealthONE of Denver, Inc., 868 F. Supp. 2d 1178, 1181 (D. Colo. 2012)(Martinez, J.)(citing Truitt v. Cty. of Wayne, 148 F.3d 644, 648 (6th Cir. 1998)).  It "halts the running of the limitations period so long as the plaintiff uses reasonable care and diligence in attempting to learn the facts that would disclose the defendant's fraud or other misconduct."  Adam N. Steinman, Statutes of Limitations-In General, 4 Fed. Prac. & Proc. Civ., § 1056 (4th ed.).  See Turgeau v. Admin. Review Bd., 446 F.3d 1052 (10th Cir. 2006)("Thus, equitable tolling excuses a plaintiff's untimely filing of a federal claim when the court determines that Congress intended that the plaintiff's federal rights should be enforced, despite his untimely filing.").  Equitable tolling is "a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs."  Wallace v. Kato, 549 U.S. 384, 396 (2007).  See Gibson v. Klinger, 232 F.3d 799, 808 (10th Cir. 2000).  In this case, there is no statute of limitations to

equitably toll.  Section 1255(k)(2) permits an alien to adjust his or her status under § 1255(a) if he

or she has not "failed to maintain, continuously, a lawful status," for an aggregate period exceeding

180 days.  8 U.S.C. § 1255(k)(2)(A).  This clause does not purport to establish the period in which

claimants may bring suit after their claims have accrued -- something that is traditionally within

courts equitable power to extend in certain cases.  See Holland v. Florida, 560 U.S. 631, 561

(2010).  The time limitation represents Congress' policy judgment concerning who is not eligible

for a status adjustment.  Time limits of this nature are abundant in state and federal laws, and

Courts do not have equitable power to honor or ignore them as they see fit in each case.  See, e.g.,

Utah Code Ann. § 76-7-305 (requiring a seventy-two-hour waiting period before an abortion is

deemed voluntary); Cal. Penal Code § 26815 (imposing a ten-day waiting period on firearm

purchases).  As an already "rare remedy,"  Wallace v. Kato, 549 U.S. at 396, equitable tolling does

not serve as workaround to every legal deadline Congress sets.

Instead, courts and agencies must interpret clear statutes as they are written.  See, e.g.,

Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 476 (1992).  It would be arbitrary and

capricious for Immigration Services to disregard, for equitable reasons, the clear deadline

Congress set.  See New Standard Pub. Co. v. Fed. Trade Comm., 194 F.2d 181, 183 (4th Cir.

1952)("[A]n administrative agency is not a court of equity.").  Congress has given no indication in

the Immigration and Nationality Act that Immigration Services can interpret its 180-day deadline

differently on a case-by-case basis other than § 1255(c)(2), which allows aliens who have failed

to maintain a lawful employment status "through no fault of his own or for technical reasons" to

adjust their status.  8 U.S.C. § 1255(c)(2).  This clause, not the equitable tolling doctrine, is the

proper avenue through which the agency may exercise some discretion.

**IT IS ORDERED** that: (i) the Defendants' Partial Motion to Dismiss Plaintiff's First Amended Complaint, filed April 25, 2018 (Doc. 29), is granted; (ii) Plaintiff's Count 1, Count 3, and Count 4 claims are dismissed without prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

William J. Howard
Ranchos de Taos, New Mexico

--and--

David J. Kline
Alexandria, Virginia

--and--

Thomas Lynn Isaacson
Mason & Isaacson, P.A.
Gallup, New Mexico

> *Attorneys for the Plaintiff*

John C. Anderson
   United States Attorney
Erin Langenwalter
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

--and--

Chad. R. Readler
   Assistant Attorney General
William C. Peachley
   Director
Glenn Girdharry
   Assistant Director
Aaron Goldsmith
   Senior Litigation Counsel
Civil Division, Office of Immigration Litigation
United States Department of Justice
Washington, D.C.

   *Attorneys for the Defendants*